### NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

### Social Services Union Local 535 SEIU, AFL–CIO, Intervenor,

v.

### HANNA BOYS CENTER, Respondent.

No. 89–70385.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 1991.

Decided Aug. 7, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc Oct. 30, 1991.

---

John D. Burgoyne, N.L.R.B., Washington, D.C., for petitioner.

George J. Tichy II, Littler, Mendelson, Fastiff & Tichy, Vincent A. Harrington, Jr., Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for respondent.

Before SCHROEDER, CANBY and NOONAN, Circuit Judges.

CANBY, Circuit Judge:

Hanna Boys Center appeals the National Labor Relation Board's order requiring Hanna to bargain with Social Services Union Local 535 of the Service Employees International Union. Hanna contends that the National Labor Relations Act does not confer jurisdiction over Hanna on the Board, or, if it does, that the exercise of such jurisdiction violates the religion clauses of the first amendment. Hanna also objects to the Board's delay of over six years in reviewing Hanna's appeal of the decision to assert jurisdiction, and the Board's refusal, in light of that delay, to reopen its certification determination to receive evidence of current facts. We affirm.

## BACKGROUND

This appeal arises out of the Union's protracted and vigorously contested attempt to represent certain lay non-faculty employees of Hanna, a residential school for boys that is owned and, arguably, operated by the Roman Catholic Church. The Union has intervened in this appeal. The parties dispute the degree of control and supervision exercised by the Church and the degree to which religion suffuses the school's mission. They also dispute the degree to which religion affects the duties of the employees that are the subject of this dispute: lay child-care workers, recreation assistants, cooks, cooks' helpers, and maintenance workers. Hanna asserts that the school is closely supervised by the Church, that its religious mission pervades its operations, and that every employee plays a role in furthering that mission. The Board's actions are based on a different view of the facts. The Board characterizes Hanna's religious mission, and its supervision by the Church, as minimal. More important to its ruling, the Board also found that the duties of the employees involved here are overwhelmingly secular.

Hanna provides education and residential supervision for boys aged ten through seventeen, pursuant to California's Nonprofit Religious Corporation Law, Cal.Corp.Code §§ 9110–9690 (West.Supp.1991). Its Articles of Incorporation in effect at the time of the Board's 1981 assertion of jurisdiction state that its purpose is

[t]o provide for the protection, care and education of homeless or neglected children; to provide homes for them; to provide, alone or in conjunction with other organizations, for their mental, moral, physical and spiritual training during their minority and thereafter; and to assist, financially and otherwise, other nonprofit tax exempt organizations engaged in similar or related activities.

In September 1980, the Union petitioned the Board for permission to conduct an election to determine representation of certain of the non-teacher employees of Hanna. Hanna and the Union stipulated that two bargaining units were appropriate. Unit A, the one involved in this appeal, consisted of child-care workers, recreation assistants, cooks, cooks' helpers, and maintenance workers. This unit voted in favor of union representation. Unit B, which voted against Union representation, consisted of all office clerical employees. All professional workers, priests, nuns, and religious brothers were excluded from both units. Because only Unit A voted in favor of representation, it alone was the subject of the Board's bargaining order that we now review.

In February 1981, the Regional Director asserted jurisdiction, finding that Hanna was not a "church-operated" school within the holding of *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (Board jurisdiction over teachers in church-operated schools not conferred by NLRA). In March 1981, the Board granted Hanna's request for review of the Director's assertion of jurisdiction. An election was held on March 18, 1981. The ballots in that election were impounded, pending board review of the assertion of jurisdiction.

In July 1987, six years and four months after the election and the Board's grant of review, the Board upheld the Director's assertion of jurisdiction, but with a different rationale. *Hanna Boy's Center & Social Services Union, Local 535, SEIU*, 284 N.L.R.B. 1080 (1987). The Board held that jurisdiction was properly asserted, relying on its earlier ruling in *Jewish Day School of Greater Washington*, 283 N.L.R.B. 757 (1987). In *Jewish Day School*, the Board ruled that *Catholic Bishop* did not prohibit jurisdiction over all employees of church-operated schools, but rather only over *teachers* employed by church-operated schools.

As to the Hanna employees at issue here, the Board noted that, "with the exception of child-care workers, the record is silent with respect to how these employees are in any way connected to the possible religious mission of the Center." 284 N.L.R.B. at 1083. It also rejected Hanna's argument that the child-care workers are "analogous to teachers":

> There is no indication in the record that the child-care workers are required to, or do in fact, involve themselves in the religious or secular teaching of the entrants. The child-care workers function as someone akin to a 'dormitory monitor' ... The child-care workers are clearly less involved in the religious inculcation of the entrants than the teachers are. The sensitive first amendment issues surrounding the assertion of jurisdiction over teachers noted by the Court in *Catholic Bishop* are not involved in the assertion of jurisdiction over the child-care workers and other unit members in the present case.

*Id.*

Hanna moved for reconsideration, and sought to submit evidence as to the "cur-

rent" facts supporting Hanna's position that Board jurisdiction was prohibited by *Catholic Bishop*, and violated the religion clauses. The Board denied these motions. After an unsuccessful attempt by Hanna to enjoin the Board from exercising jurisdiction,[1] the Board, in February 1988, counted the ballots. Unit A, the employees at issue here, voted for Union representation, and in April 1988, the Board certified the Union as their representative. Hanna objected to the election and to the certification.

In order to obtain review of the Board's decision, Hanna refused to bargain with the Union or to provide it with information pertinent to representation. In March 1989, the Board found Hanna to have engaged in unfair labor practices and issued an order requiring Hanna to bargain with the Union. The Board based its ruling on the record before the Board in the 1980–81 proceedings. The Board refused to reopen the factual record, ruling that the evidence offered was not newly discovered and previously unavailable evidence in existence at the time of the original proceedings. The Board further ruled that there were no special circumstances justifying reopening those proceedings. This appeal followed.

## DISCUSSION

### A. Delay

Before we turn to the merits of the Board's decision, we consider the effect of the Board's delay in ruling on Hanna's appeal of the Board's original assertion of jurisdiction. Hanna raises two arguments based on that delay, one of which concerns the scope of the factual record under review. Hanna argues first that, on account of the delay, the Board's order to negotiate

---

**1.** After denial of its motion for reconsideration, Hanna filed an action in federal district court seeking a declaration that the Board lacked jurisdiction, and an injunction against ballots being counted. The district court ordered a 90 day stay, suggesting that, in light of the lengthy delay, the Board should consider supplemental evidence of current conditions. The Board appealed the stay. In a one-sentence Order, a motions panel of this Court reversed and vacat-

ed the stay. The district court subsequently dismissed Hanna's action for lack of subject matter jurisdiction. Hanna appealed that dismissal, and this court affirmed in *Hanna Boys Center v. Miller*, 853 F.2d 682 (9th Cir.1988). In that opinion, we held that the motions panel's earlier Order implicitly relied on a finding of lack of subject matter jurisdiction, and that such a finding constituted the law of the case.

should not be enforced. Alternatively, Hanna argues that the Board should have reopened the record to admit evidence of "current" facts, and based its review on that evidence.

### 1. Delay as a basis for denying enforcement

■ The APA requires that all administrative agencies, including the Board, conclude any matter submitted to them "within a reasonable time." 5 U.S.C. § 555(b). The delay in this case can hardly be called "reasonable." It is egregious, and we deplore it. There is no suggestion here that either Hanna or the Union contributed to this delay. As it turns out, however, the beneficiary of that delay is Hanna, which has received over six years of reprieve from the Board's jurisdiction which it resists on this appeal. The victims are the employees who voted in 1981 for union representation.

The APA does not require refusal to enforce an administrative order as a remedy for failure to abide by section 555(b). We decline to impose such a sanction, when its effect would only be to continue the deprivation of the right of these employees to union representation, as provided by the NLRA. Instead, we adopt the practice of the Second and Seventh Circuits when faced with similar Board-caused delay:

> We believe that frustration of the policies of the [LMRA] is an inevitable result of the egregious administrative delay in this case no matter how we rule. Because we conclude that fewer policies are frustrated by enforcement than by nonenforcement, we choose the former.

*NLRB v. Parents & Friends of the Specialized Living Center,* 879 F.2d 1442, 1457 (7th Cir.1989), quoting *NLRB v. Star Color Plate Serv.,* 843 F.2d 1507, 1509–10 (2d Cir.), *cert. denied,* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988).

### 2. The propriety of refusing to receive new evidence.

■ In conjunction with its motion for reconsideration of the Board's decision, Hanna sought to introduce evidence of "substantial changes in Hanna's corporate status, Bylaws, Mission Statement and actual duties of employees within the unit" that had occurred after 1981. The Board rejected that evidence, ruling that the proffered evidence was neither "newly discovered and previously unavailable evidence, nor does it allege any special circumstances that would require the Board to reexamine the decision made in the representation proceeding." *Hanna Boys Center and Social Services Union Local 535, SEIU,* 293 N.L.R.B. No. 39, 130 LRRM 1430, 1431 (March 21, 1989). Hanna argues that the Board erred in refusing the proffered evidence and, thus, improperly affirmed its jurisdiction on the basis of stale evidence.

Hanna's request to reopen the record amounts to a request that the Board start afresh with completely new determinations of the appropriateness of its jurisdiction. Such a procedure is not warranted by the nature of the "new" facts offered here, and is prohibited by settled rules. The Board, and this court, have firmly enforced the Board's regulation that in the absence of special circumstances[2], it will not accept new evidence unless the moving party shows that the additional evidence is "newly discovered," that is, it was in existence at the time of the proceeding before the Board, but has become available only since the close of the hearing. 29 C.F.R. Sec. 102.48(d)(1). That regulation further provides that the Board will not reopen the record unless the moving party also demonstrates "that the new evidence would require a different result." *Id. See NLRB v. Cutter Dodge, Inc.,* 825 F.2d 1375, 1380–81 (9th Cir.1987).

■ That regulation is complemented by the rule, repeatedly affirmed by this court, that "passage of time for the orderly adjudication of labor disputes cannot be used as a basis for denying an enforcement order. The relevant period for determining the appropriateness of the bargaining order is as of when it was before the NLRB." *NLRB v. Coca–Cola Bottling Co.,* 472 F.2d 140, 141 (9th Cir.1972) (citations omitted). *See NLRB v. Bakers of Paris, Inc.,* 929 F.2d 1427, 1448 (9th Cir.1991), and cases cited therein. A review of those cases

---

**2.** The Board held, and we agree, that Hanna had shown no special circumstances justifying an exception in this case.

demonstrates that "before the NLRB" refers to the factual circumstances presented to the Board upon which it originally acted, not the circumstances at the time the Board ruled on an appeal of that action. *See, e.g., L'Eggs Products, Inc. v. NLRB,* 619 F.2d 1337, 1353 (9th Cir.1980) (As to whether the "[B]oard should consider subsequent events, up to the time of its [reviewing] decision ... we find no cases in this circuit that remand to the Board because of a lack of evidence on the record of consideration of such events"). Finally, it is well settled that "[t]he Board has considerable discretion in the grant or denial of a motion to reopen the record [and] [t]he Board's decision on such a motion will not be set aside unless shown to constitute an abuse of discretion." *Cutter Dodge,* 825 F.2d at 1380.[3]

Hanna concedes that its supplemental evidence attests only to facts that came into existence after the Board initially asserted jurisdiction in 1981. While the Board's delay here may constitute an abuse of its obligation to enforce the NLRA and to abide by the APA, we do not believe that its refusal to reopen the record was such an abuse of discretion that we should remand to require it, in effect, to start all over again. We proceed, then, to review the Board's order on the record properly before the Board. *See* Fed.R.App.P. 16(a); 29 U.S.C. § 160(e).

### B. The Board's Statutory Jurisdiction

#### 1. Standard of Review

We review de novo the Board's purely legal conclusion that *Catholic Bishop* applies only to teachers in parochial schools. *NLRB v. Buckley Broadcasting Corp. of California,* 891 F.2d 230, 232 (9th Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990). We review

for substantial supporting evidence the Board's factual finding that none of the employees here were functionally equivalent to teachers. *Id.;* 29 U.S.C. § 160(e) (1988). We will affirm that finding "if there is a choice between two fairly conflicting views of the evidence, 'even though the court would justifiably have made a different choice had the matter been before it de novo.'" *M.W. Kellogg Constructors, Inc. v. NLRB,* 806 F.2d 1435, 1438 (9th Cir.1986) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)).

#### 2. The Scope of Catholic Bishop

■ No one disputes that the plain language of the National Labor Relations Act encompasses the employment relationship between Hanna and these employees. *See* NLRA § 10(a), 29 U.S.C. 160(a) (1988). Hanna argues, however, that the restriction on the Board's jurisdiction imposed in *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), applies here. We disagree.

In *Catholic Bishop,* the Supreme Court reviewed the Board's assertion of jurisdiction over lay faculty members at two groups of Catholic high schools. The Court granted certiorari to consider two issues:

(a) Whether teachers in schools operated by a church ... are within the jurisdiction granted by the [NLRA]; and (b) if the act authorizes such jurisdiction, does its exercise violate the guarantees of the Religion Clauses....

440 U.S. at 491, 99 S.Ct. at 1314.

The court answered the first question in the negative, to avoid the severe constitutional problems presented by the second. The Court recognized "the critical and unique role of the teacher in fulfilling the

---

**3.** We reject Hanna's argument that these rules apply only when the employer or the union cause the delay. We have, indeed, acknowledged that one reason for these rules is to avoid "put[ting] a premium upon continued litigation by the employer; [whereby] it can hope that the resulting delay will produce a new set of facts, as to which the Board must then readjudicate." *NLRB v. L.B. Foster Co.,* 418 F.2d 1, 4 (9th

Cir.1969). The rule is not limited to those facts, however: *"[R]egardless of fault,* [delay] is an unfortunate but inevitable result of the process of hearing, decision and review prescribed in the Act." *Id.* (emphasis added). The ultimate policy which these rules serve was succinctly stated in *L'Eggs:* "There must be an end to litigation in Labor Board cases." 619 F.2d at 1353.

mission of a church-operated school." *Id.* at 501, 99 S.Ct. at 1319. It noted the constitutional difficulties that would result from Board jurisdiction over the relationship between such teachers and their employers. After reviewing the legislative history of the NLRA, the Court concluded that

> in the absence of a clear expression of Congress' intent to bring teachers in church-operated schools within the jurisdiction of the Board, we decline to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses.

*Catholic Bishop,* 440 U.S. at 507, 99 S.Ct. at 1322.

Hanna contends that the effect of *Catholic Bishop* is to exclude church-operated schools, as entire units, from the coverage of the NLRA. It refers to the following statement of the Court:

> Congress simply gave no consideration to church-operated schools....
>
> *    *    *    *    *    *
>
> ... A close examination of that legislative history ... reveals nothing to indicate an affirmative intention that such schools be within the Board's jurisdiction.

**4.** "Here ... the record affords abundant evidence that the Board's exercise of jurisdiction over teachers in church-operated schools would implicate the guarantees of the Religion Clauses." *Catholic Bishop,* 440 U.S. at 507, 99 S.Ct. at 1322.

The opinion notes that the Seventh Circuit opinion which it was reviewing had recited a number of actual instances of Board jurisdiction over church-operated schools which had provoked first amendment challenges. *Id.* at 502, 99 S.Ct. at 1319. A review of those examples reveals that every such challenge involved teachers. *See Catholic Bishop of Chicago v. NLRB,* 559 F.2d 1112, 1125–26 (7th Cir.1977).

**5.** The court repeatedly discusses the effect of board jurisdiction over teachers as teachers, not as proxies for other employees. *See, e.g.:*
> The key role played by teachers in such a school system has been the predicate for our conclusions that governmental aid channeled through teachers creates an impermissible

*Catholic Bishop,* 440 U.S. at 504–05, 99 S.Ct. at 1321. Despite this language, we think it clear from the rest of the Court's opinion that the ruling of *Catholic Bishop* is not nearly so broad as Hanna contends.

The facts of *Catholic Bishop* are confined to Board jurisdiction over teachers. Other employees of parochial schools, whether professional or "blue collar," are expressly excluded from the ruling. *Id.* at 493 n. 5, 99 S.Ct. at 1315 n. 5. The Court did not base its holding simply on congressional failure to consider church-operated schools *per se,* as the selective quotation relied upon by Hanna might imply. The difficult constitutional question that the Court sought to avoid was that which would flow "from the Board's exercise of jurisdiction over teachers in church-operated schools." *Id.* at 504, 99 S.Ct. at 1320.[4] That point was reiterated throughout the Court's opinion,[5] and it was clearly founded on the "unique role" of teachers in accomplishing the religious goals of the school. *Id.* at 501, 99 S.Ct. at 1319. That was the concern which led the Court toward a construction of the NLRA that excluded the Board's jurisdiction over disputes involving such teachers, and which caused the Court to comb the legislative history to see whether anything in it foreclosed such a construction. Its review satisfied the Court that "[t]here is no clear expression of an affirmative intention of Congress

risk of excessive government entanglement....

Only recently we again noted the importance of the teacher's function in a church school: "Whether the subject is 'remedial reading,' 'advanced reading,' or simply 'reading,' a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular instruction persists." *Meek v. Pittenger,* 421 U.S. 349, 370 [95 S.Ct. 1753, 1766, 44 L.Ed.2d 217] (1975).

*Catholic Bishop,* 440 U.S. at 501, 99 S.Ct. at 1319.
The church-teacher relationship in a church-operated school differs from the employment relationship in a public or other nonreligious school.

*Id.* at 504, 99 S.Ct. at 1320.
Congress did not contemplate that the Board would require church-operated schools to grant recognition to unions as bargaining agents for their teachers.

*Id.* at 506, 99 S.Ct. at 1322.

that teachers in church-operated schools should be covered by the Act." *Id.* at 504, 99 S.Ct. at 1320. Both the rationale and the language of the *Catholic Bishop* opinion accordingly support the limitation of its holding to the employment relationship between church-operated schools and its teachers.[6]

Of course, the rationale of *Catholic Bishop* would also support the exclusion from the Board's jurisdiction of other employment relationships if they involved the same constitutional problems inherent in the relationship between teachers and church-operated schools. For reasons that we will make clear below, we are convinced that there are no such severe constitutional questions raised by the Board's exercise of jurisdiction over the relationship between Hanna and its secular employees who are not significantly involved in teaching. We are not constrained, then, as the Supreme Court was in *Catholic Bishop,* to construe the NLRA more narrowly than its plain language invites. We interpret the Act to apply to Hanna's non-teaching employees involved in this appeal.

*3. Child-care workers as teachers*

■ Hanna argues, alternatively, that even if *Catholic Bishop* prohibits Board jurisdiction only over teachers in parochial schools, the employees here are the functional equivalent of teachers, and therefore within the holding of *Catholic Bishop.*

We reject as unsupported by the record any suggestion that Hanna's cooks, cook's helpers, recreation assistants and mainte-nance workers are to any significant degree "teachers" whose role is particularly involved with the accomplishment of the religious goals of Hanna. For all that appears, cooks primarily prepare food. Comparable conclusions can easily be drawn from the record regarding the other employees of the bargaining unit, with the possible exception of the child-care workers. Even there, however, the record supports the Board's finding that the role of the child-care workers was not significantly involved with religion. The Board described their duties as follows:

> Child-care workers "shepherd" the boys from their cottages to chapel, supervise the boys in their cottages, and make sure the boys do their housekeeping chores and homework (which may include work from the moral guidance course), see that the boys say their prayers, and select a boy to say the evening prayer. The child-care worker job description lists eight basic responsibilities as well as qualifications for the job. The only reference to the child-care worker's involvement in religious activity is in 1(D) of the listing of responsibilities ... This includes "D. Teaching values: ethical principles, religious observances." The qualifications section contains no reference to religion.

There is no indication in the record that the child-care workers are required to, or do in fact, involve themselves in the religious or secular teaching of the entrants. The child-care workers function as someone akin to a "dormitory monitor," an authority figure to super-

---

**6.** Although this court has not yet faced this precise issue, two of our previous cases, dealing with closely related concerns, have emphasized *Catholic Bishop*'s exclusive focus on teachers. *See St. Elizabeth Community Hospital v. NLRB,* 708 F.2d 1436, 1440 (9th Cir.1983) (*Catholic Bishop* does not prohibit Board jurisdiction over non-religious service employees of church-run hospital); *NLRB v. World Evangelism, Inc.,* 656 F.2d 1349, 1353 (9th Cir.1981) (*Catholic Bishop* does not prohibit Board jurisdiction over employees of a church's commercial operations.)

Hanna cites two Second Circuit cases in support of its broad reading of *Catholic Bishop. NLRB v. Bishop Ford Central Catholic High School,* 623 F.2d 818, 819–20 (2d Cir.1980), *cert.* *denied,* 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981); *Christ the King Regional High School v. Culvert,* 815 F.2d 219, 222 (2d Cir. 1987), *cert. denied,* 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 63 (1987). Those opinions both contain statements that *Catholic Bishop* ruled that the Board lacks statutory jurisdiction over church-operated schools. We are not dissuaded from our conclusion by those statements, however, because both cases also contain statements that *Catholic Bishop* precludes Board jurisdiction over teachers in church-run schools. Further, neither opinion discussed the issue of the scope of *Catholic Bishop*'s ruling, nor were their broader descriptions of that ruling necessary to their decisions, since both cases dealt only with bargaining units composed solely of teachers.

vise the entrants when they are not in class.

*Hanna Boys Center,* 284 N.L.R.B. at 1083. Thus, while their job description includes a teaching function, the Board found no evidence that the actual duties of the child-care workers included any teaching. Supporting that finding is the fact that Hanna stipulated to this bargaining unit, suggesting that Hanna considered child-care workers similarly situated for labor relations purposes with cooks and maintenance workers.

Hanna paints a different picture of the child-care workers and the other affected employees, asserting that they are intimately involved with the students as spiritual and theological mentors. Our review, however, is confined to determining whether the Board's findings of fact are supported by substantial evidence in the record. *NLRB v. Buckley Broadcasting Corp. of California,* 891 F.2d 230, 232 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990). The record which we review is that which was before the Board in its review of the Director's assertion of jurisdiction in 1981. Fed.R.App.P. 16(a); 29 U.S.C. § 160(e). There is ample support in that record for the Board's finding that these employees, including the child-care workers, are secular employees with no teaching function. We conclude, therefore, that all of the employees in Bargaining Unit A are within the statutory jurisdiction of the Board.

### C. The Constitutionality of Board Jurisdiction

In light of its construction of the NLRA, the Supreme Court in *Catholic Bishop* did not have to face the second issue for which it granted certiorari—"if the act authorizes such jurisdiction, does its exercise violate the guarantees of the Religion Clauses of the first amendment?" *Catholic Bishop,* 440 U.S. at 491, 99 S.Ct. at 1314. We reach that question here, and conclude that the Board's exercise of jurisdiction in the circumstances of this case is clearly constitutional.

### 1. The Establishment Clause

The establishment clause of the first amendment requires government neutrality with respect to religion. *Abington School District v. Schempp,* 374 U.S. 203, 215, 83 S.Ct. 1560, 1567, 10 L.Ed.2d 844 (1963). It was intended to protect against "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (quoting *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)). To pass constitutional muster, the Board's application of the NLRA to Hanna's non-teaching employees (1) must have a secular purpose, (2) must have a primary effect that neither advances nor inhibits religion, and (3) must not foster excessive state entanglement with religion. *See Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111.

Congress' purpose in enacting the NLRA was clearly secular—to minimize industrial strife by protecting employees' rights to organize and bargain collectively. *NLRB v. Jones & Laughlin,* 301 U.S. 1, 42–43, 57 S.Ct. 615, 626–627, 81 L.Ed. 893 (1937). Similarly, the NLRA's primary effect is to require collective bargaining and reduce labor disruptions, rather than to promote or deter the acceptance or perpetuation of any religion. *St. Elizabeth Community Hospital,* 708 F.2d 1436, 1441 (9th Cir.1983). Nothing in the record suggests that the Board's exercise of jurisdiction over Hanna deviated from this secular purpose or primary effect.

If there is any establishment clause violation here, it must be found in *Lemon*'s third, "entanglement" prong. *Lemon* articulated three factors to be weighed in determining excessive entanglement: "the character and purpose of the institution[ ] that [is] benefited, the nature of the aid that the State provides, and the resulting relationship between government and the religious authority." *Lemon,* 403 U.S. at 615, 91 S.Ct. at 2112.

### a. Character and purpose of Hanna

Hanna's purpose includes "mental, moral, physical, and spiritual training" of homeless or neglected boys, as well as providing for their "protection, care and education." Secular education, therapy and residential supervision are the primary activities of Hanna. The Board's description of Hanna's operations, however, demonstrates that Hanna is clearly, though loosely, affiliated with the Roman Catholic Church, and that religion plays a small but significant part in both its operations and its mission. *Hanna*, 284 N.L.R.B. at 1080–83. Control and direction of Hanna is vested in a Board of Directors and an Executive Director. The Board can include as many as 45 members of which only four can be clergy. Of those four, only two can vote. The Executive Director is appointed by the President/Bishop of Santa Rosa Diocese, subject to the approval of the Board. The Executive Director, who is responsible for the general direction and control of Hanna need not be, but always has been, a priest. There is no requirement that any employee or student of Hanna be Roman Catholic or associated with any other religious organization.

Hanna's students are required to attend chapel every morning for prayers and Mass on Sundays and Holy Days. There are prayers at the beginning and end of class as well as before and after all meals, and in the evening before the lights are put out. The curriculum includes a mandatory "moral guidance" class taught by nuns on the faculty. This class is principally devoted to the teaching of "salvation history," using the Bible and Catholic tradition as sources, as well as exposing the boys to the tenets of other religions. These features of Hanna's operation demonstrate that, although Hanna's primary purpose and character is secular—to provide housing, education and therapy to "homeless or neglected" boys—the Catholic faith of its founders is woven thoroughly into the institution.

### b. Nature of the activity the government mandates—Board jurisdiction

Although Hanna as an institution is infused with an important religious component, there is substantial evidence in the record to support the Board's determination that Hanna's religious character and mission is furthered by others than the employees of Bargaining Unit A. The employees of Unit A do not conduct religious services or teach moral guidance or any other subjects. Indeed, those functions are performed by priests, nuns, religious brothers and professional workers who are excluded from any bargaining unit. Board jurisdiction over the employment relations between Hanna and the employees of Bargaining Unit A will be confined to overseeing issues arising in the area of labor relations and collective bargaining. Because those employees' duties, as found by the Board, are overwhelmingly secular, arbitration of grievances arising out of that employment should not involve the Board in issues of theology. Nor will it render any benefit to the Catholic religion or any other religion, or advance non-religion over religion generally. Furthermore, neither Hanna nor the Roman Catholic Church embraces any religious tenets that would be affronted by unionization or collective bargaining. Unlike the jurisdiction over parochial school faculty dealt with in *Catholic Bishop*, Board jurisdiction over these employees should involve the Board minimally, if at all, in Hanna's religious mission.

### c. The resulting relationship between government and Hanna

Board jurisdiction here will require governmental involvement only with respect to specific charges which may be filed on behalf of these employees. It will not involve the Board in continuing or systematic monitoring of the Church's activities and should not involve monitoring the religious aspects of Hanna's activities at all. Board involvement will not create the reality or the appearance of the government's supervising or collaborating with the Church.

### d. Weighing

As the Court recognized in *Lemon*, "total separation between church and state . . . is not possible in an absolute sense.

Some relationship between government and religious organizations is inevitable." 403 U.S. at 614, 91 S.Ct. at 614. Unlike the situation in *Lemon* and the cases *Lemon* cites, Board jurisdiction here does nothing to "establish" religion. Nor does Board jurisdiction here present a threat to government neutrality with respect to religion. Thus, it is purely entanglement, per se, which Hanna asserts as the ground for a first amendment violation. That entanglement is not sufficient to create "active involvement of the sovereign in religious activity." *Lemon*, 403 U.S. at 612, 91 S.Ct. at 2111.

This court's conclusion in *St. Elizabeth Hospital*, aptly describes the situation before us:

> Board involvement with [this institution] will be limited and will present only a minimal burden upon the religious practices of the [institution's] operators. Board jurisdiction will produce only incidental intrusion by requiring examination of [the institution's] actions and conduct only with respect to specific charges which may be filed in the limited area of collective bargaining and labor relations. Certainly there is no prospect of continuing government surveillance of the type the Supreme Court condemned in *Lemon*. . . .

708 F.2d at 1442 (citation omitted). Because of the extremely limited intrusion of Board jurisdiction on the religious aspects of Hanna's operations, there is no establishment clause violation here.

*2. Free exercise clause*

■ Hanna also argues that Board jurisdiction over these employees violates Hanna's right of free exercise of religion, by unduly intruding into its affairs, and burdening its "ability to shape the atmosphere by which it instills Roman Catholic values in its students."

An initial question arises concerning what standard should be used to evaluate Hanna's free exercise claim. For the past twenty-five years, we have evaluated such claims through the use of the balancing test first established in *Sherbert v. Verner*,

374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). After the parties filed their briefs in this case, however, the Supreme Court decided *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *Smith* held that the free exercise clause is not violated if a law (1) is "generally applicable and otherwise valid," *id.* at 1600; (2) does not have as its "object" the burdening of religion and only has an "incidental effect" on religious practices or beliefs, *id.*; (3) does not implicate another constitutional right other than free exercise of religion and thereby give rise to a "hybrid claim", *id.* at 1601–02; and (4) punishes conduct which constitutes a criminal act. *See id.* at 1602–03; *see also The Supreme Court, 1989 Term—Leading Cases*, 104 **Harv.L.Rev.** 198, 201 (1990) (listing these elements). The initial question thus arises whether Hanna's claims should be evaluated using the traditional *Sherbert* balancing test or the more restrictive test authorized in certain situations by *Smith*.

Were this issue determinitive, we would ask for supplemental briefing on the *Smith* test, although we have serious doubts regarding its applicability in light of part four of that test. We need not decide whether *Smith* applies, however, because we find that Hanna's free exercise claims do not survive even the less restrictive *Sherbert* balancing test. We have described that analysis as requiring the weighing of three factors: (1) how much Board jurisdiction will interfere with the exercise of religious beliefs; (2) the existence of a compelling or overriding state interest justifying a burden on religious beliefs; and (3) whether accommodating those beliefs would unduly interfere with the fulfillment of the government interest. *EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1279 (9th Cir.1982).

Board jurisdiction will clearly circumscribe Hanna's operation, as suggested by the vigor with which Hanna resists such jurisdiction. However, under the first of these factors, "the relevant inquiry is not the impact of the statute upon the *institu-*

**1306**

*tion,* but the impact of the statute upon the institution's exercise of its sincerely held *religious beliefs." Id.* at 1280 (emphasis added) (*quoting EEOC v. Mississippi College,* 626 F.2d 477, 488 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981)).

Board jurisdiction here will not interfere with the free exercise of *religious beliefs* of anyone at Hanna. Catholic doctrine has no objection to unionization or collective bargaining. The pervasively secular nature of these employees' duties ensures that Board involvement in labor disputes will be confined to the secular aspects of Hanna's operations. Hanna's free exercise rights are scarcely implicated at all.

Against this minimal showing of any impact on religious belief or practice, we must balance the compelling governmental interest in "promot[ing] the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation." *Fibreboard Corp. v. NLRB,* 379 U.S. 203, 211, 85 S.Ct. 398, 403, 13 L.Ed.2d 233 (1964). When these factors are weighed against each other, it is clear that Board jurisdiction here will not impermissibly interfere with Hanna's free exercise of religion. There is no violation, then, of the free exercise clause, whether tested by the traditional balancing analysis, or the broad categorical standard of *Smith.*

### CONCLUSION

*Catholic Bishop* does not apply to the nonfaculty employees of Hanna involved in this appeal. The NLRA conferred authority on the Board to assert jurisdiction over this bargaining unit. Board jurisdiction here does not violate the first amendment's religion clauses. Therefore, the Board's order requiring Hanna to bargain with the Union, though unjustifiably tardy, shall be enforced.

ORDER ENFORCED.