F I L E D
United States Court of Appeals
Tenth Circuit

AUG 27 1997

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

FRIENDS OF THE BOW, WYOMING
OUTDOOR COUNCIL, LEILA R.
STANFIELD, DONALD J. DUERR,
and JEFF KESSLER,

     Plaintiffs-Appellants,

v.

TOM L. THOMPSON, Deputy
Regional Forester, U.S. Forest Service
Rocky Mountain Region, JACK
WARD THOMAS, Chief, U.S. Forest
Service, and THE UNITED STATES
FOREST SERVICE,

     Defendants-Appellees,

and

BIG HORN LUMBER CO., INC.,

Intervenor.

No. 96-1460

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 94-D-1370)

---

Mark Squillace, Laramie, Wyoming (Reed Zars, Laramie, Wyoming, with him on
the briefs) for Plaintiffs-Appellants.

Joan M. Pepin, Department of Justice, Washington, D.C. (Lois J. Schiffer, Assistant Attorney General, Washington, D.C., Henry L. Solano, United States Attorney, Denver, Colorado, Robert D. Clark, Assistant United States Attorney, Denver, Colorado, Robert L. Klarquist, Department of Justice, Washington, D.C., and Kenneth Capps, Department of Agriculture, Denver, Colorado, with her on the briefs) for Defendants-Appellees.

Scott W. Horngren, Haglund & Kirtley, Portland, Oregon (Michael G. Neff, Haglund & Kirtley, Portland, Oregon and Kim E. Ikeler, Krendl, Horowitz & Krendl, Denver, Colorado, and with him on the briefs) for Intervenor.

---

Before **EBEL, HENRY,** and **BRISCOE**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

This case involves a dispute concerning the United States Forest Service's approval of a timber sale, known as the "Banner Timber Sale," in the Medicine Bow National Forest. Friends of the Bow ("Friends"), an environmental group, objected to the sale, and brought suit in the District of Colorado against the Forest Service and the two Forest Service officials who approved the sale. Bighorn Lumber Co., the purchaser of the sale, intervened to defend the sale. Specifically, Friends claims that: (1) approval of the sale was "arbitrary and capricious" under the Administrative Procedures Act; (2) the Forest Service should have conducted a supplemental environmental assessment based on new evidence concerning the forest's sustainable yield; (3) the Forest Service did not respond specifically to

issues raised by Friends in their administrative appeal of the decision, as is required by 5 U.S.C. § 555(e) (1994); and (4) the Forest Service violated 5 U.S.C. § 555(b) (1994) in failing to respond to Friends' request that the Service prepare a supplemental environmental assessment. The district court granted summary judgment against Friends on all four claims, and Friends now appeals. We have jurisdiction under 28 U.S.C. § 1291 (1994) and affirm.

## Statutory Background

The factual background of this case is best understood in the context of the relevant statutes, as the most relevant facts are the various procedures the United States Forest Service has gone through in attempting to conduct the Banner sale, and the various objections that Friends has made to those procedures based on the relevant statutes. Accordingly, we first set forth the applicable statutory requirements before discussing the factual background of the case.

There are three statutes relevant to this appeal: the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq.; the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq.; and the Administrative Procedure Act of 1946 ("APA"), 5 U.S.C. § 500 et seq. We will discuss each statute in turn.

**A.      The National Environmental Policy Act**

NEPA sets forth "a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences." Robertson v. Methow Valley Citizens' Council, 490 U.S. 332, 350 (1989).  Importantly, the statute does not impose substantive limits on agency conduct. Id.  Rather, once environmental concerns are "adequately identified and evaluated" by the agency, NEPA places no further constraint on agency actions.  Id.

The primary procedure that NEPA establishes to ensure that agencies take a "hard look" at the environmental consequence of their actions is the Environmental Impact Statement ("EIS").  An EIS is a detailed statement of the environmental impact of a proposed action, and must be prepared whenever a federal agency proposes a "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332 (1994).

The NEPA makes no mention of Environmental Assessments ("EAs"), which are the documents agencies prepare in preparation for less significant agency actions.  However, the Council on Environmental Quality (CEQ) has issued regulations that govern agency decisions regarding whether to prepare an EIS, and those regulations also outline the requirements for preparing an EA. 40 C.F.R. § 1500 et seq.  The Supreme Court has stated that these regulations are

entitled to "substantial deference." Marsh v. Oregon Natural Resource Council, 490 U.S. 360, 372 (1989).

The CEQ regulations provide that an agency may prepare an EA to determine whether an EIS is necessary. 40 C.F.R. § 1501.4, 1508.9(a) (1996). If the EA indicates that the proposed action will not significantly impact the environment, the agency may make a finding of no significant impact, or "FONSI." Id. § 1501.4(e). Where a FONSI is made, the agency need not prepare a full EIS. Id. § 1501.4(e); see Park County Resources Council v. United States Dep't of Agric., 817 F.2d 609, 621 (10th Cir. 1987), overruled in other respects by Village of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970, 973 (10th Cir. 1992) (en banc).

When an EIS has been prepared for an action, the CEQ regulations encourage the agency to incorporate its conclusions into EAs prepared for all subsequent and smaller actions. 40 C.F.R. § 1502.20 (1996). However, the regulations require agencies formally to supplement the EIS through a Supplemental Environmental Impact Statement (SEIS) only when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," id. § 1502.9(c)(1)(i), or when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Id. § 1502.9(c)(1)(ii).

## B.     The National Forest Management Act

The NFMA requires the United States Forest Service (the "Forest Service" or "USFS") to develop Land and Resource Management Plans ("Forest Plans") for the management of National Forests.  16 U.S.C. § 1604(a), (b) (1994).  Forest Plans are required to "provide for multiple use and sustained yield of the products and services obtained [from national forests] . . .," and "determine forest management systems [and] harvesting levels" to be maintained on the relevant forest.  Id. § 1604(e).  Such plans must be revised at least every fifteen years, and must be prepared by an interdisciplinary team.  Id. § 1604(f)(5), (f)(3).

Additionally, the NFMA requires the Forest Service to limit the sale of timber from each national forest to "a quantity equal to or less than a quantity which can be removed from such forest annually in perpetuity on a sustained-yield basis."  Id. § 1611(a).  This figure is known as the forest's long-term sustained yield capacity ("LTSYC").  The Service is also required to set annual harvest levels, or "allowable sale quantit[ies]" ("ASQs") based on sustainable yield principles.  Id. § 1604(e)(2).  In any given year, the Service may exceed the annual ASQ for a particular forest, "so long as the average sale quantities of timber from such national forest over the decade covered by the plan do not exceed such quantity limitation."  Id. § 1611(a).  The ASQ may be modified, but

- 6 -

only through a revision of the forest plan, with full public participation.  Id. §
1604(d).

## C.    The Administrative Procedures Act

The APA governs agency procedures in all administrative proceedings.

Under the APA, agency functions are characterized as either "rulemakings" or

"adjudications." 5 U.S.C. § 551 (1994) (defining "adjudication" as the

formulation of an "order," and "order" as the "whole or part of a final disposition

. . . other than rule making but including licensing").  With regard to informal

adjudications, i.e., those not conducted on the record after the opportunity for an

agency hearing, "interested persons" are entitled to a "brief statement of the

grounds for denial" when an agency denies "a written application, petition, or

other request . . . made in connection with any agency proceeding."  Id. § 555(e).

Further, when an interested person makes a request for agency action, the person

is entitled to have the agency conclude the matter presented to it "within a

reasonable time."  Id. § 555(b).

> We have held that
>
> [t]he statement of grounds [under 5 U.S.C. § 555(e)] must be
> sufficiently detailed that the reviewing tribunal can appraise the
> agency's determination under the appropriate standards of
> review. . . .  [T]he statement of grounds must be sufficiently detailed
> that we can determine whether the [agency] considered the relevant

factors and that the choice it made based on those factors is a reasonable one.

City of Gillette v. FERC, 737 F.2d 883, 886 (10th Cir. 1984).

When an interested person objects to agency action, the agency action is typically reviewed under an "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard. 5 U.S.C. § 706(2)(A) (1994). Although our "ultimate standard of review [under § 706] is a narrow one," in determining whether the agency acted in an "arbitrary and capricious manner," we must ensure that the agency "decision was based on a consideration of the relevant factors" and examine "whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Generally, an agency decision will be considered arbitrary and capricious if "the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

**Factual Background**

The present dispute concerns the Forest Service's approval of a single timber sale -- the Banner sale -- in the Medicine Bow National Forest, which is located in Wyoming. Medicine Bow is subject to a forest plan, which was promulgated by the Forest Service in 1985. Consistent with normal agency practice, the Service conducted a programmatic EIS to accompany the forest plan. See Idaho Conservation League v. Mumma, 956 F.2d 1508, 1511-12 (9th Cir. 1992) (discussing administrative practice of Forest Service).

The forest plan set out broad management goals, guidelines, and standards for the forest. The plan also included a projected timber sale schedule for the years 1986 through 1995. That schedule specifically identified the Banner sale.

Forest plans are implemented through individual projects proposed by the Forest Supervisor. See Idaho Conservation League, 956 F.2d at 1512. For each proposed project, the Service prepares an EA, in which the agency considers the environmental implications of each of a range of options for the particular site-specific project. If the EA does not raise significant environmental concerns unique to the site, the Service makes a FONSI and does not complete a full EIS.

The EA for the Banner sale was released on March 19, 1993. The EA, which was over 100 pages long, evaluated the environmental impacts of various proposed management actions in the Banner area. Specifically, the EA analyzed

four alternatives: Alternative 1, under which no action would take place; Alternative 2, which consisted of a 30-unit timber sale, comprising 6.73 million board feet (mmbf), and certain restoration projects; Alternative 3, which consisted of a smaller timber sale, and the same restoration projects; and Alternative 4, which consisted of only the restoration projects.

On April 25, 1993, the Forest Supervisor issued a decision notice and FONSI, in which he selected Alternative 2. The eleven page decision listed a number of reasons for choosing Alternative 2 over the other alternatives. One of these reasons was that Alternative 2 offered the highest benefit/cost ratio of the various alternatives. That reason was cited as a "key" reason, along with the explanations that Alternative 2 would enhance commercial timber supply and environmental stability, and was most consistent with the management objectives as outlined in the forest plan. Among the other reasons cited by the Forest Supervisor in selecting Alternative 2 were improved diversity of vegetation and aesthetics in the forest; a general reduction in negative visual effects caused by the contrast between older clear-cuts and the forest area that would be harvested in the Banner sale; enhanced timber supply and economic stability; and improved erosion and sedimentation conditions due to the elimination of approximately 20 miles of existing roads.

After an alternative is selected, Forest Service personnel typically "cruise" a project site in preparation for offering the timber sale for bidding. During the "cruise," the service identifies trees that may not be cut for various technical and environmental reasons, marks the boundaries of the sale, and identifies those trees that may not be cut. In cruising the Banner site prior to sale, the Service determined that Alternative 2 would yield 55% fewer trees for sale on 362 fewer acres than originally anticipated, for a sale offering of 3.1 mmbf. On May 17, 1994, the Forest Service sold the 509-acre Banner sale to intervenor Bighorn Lumber Company.

On June 3, 1993, plaintiffs Leila Stanfield and Donald J. Duerr, on behalf of Friends, brought an administrative appeal challenging the Banner sale. The appeal alleged violations of NEPA, the APA and the NFMA. That appeal was rejected by Deputy Regional Forester Tom Thompson, and the Chief of the Forest Service denied discretionary review.

Friends then filed suit in the United States District Court for the District of Colorado, claiming that Thompson's response to the administrative appeal violated 5 U.S.C. § 555(e) (1994). The court ruled in Friends' favor, and remanded the case to the agency to make a more detailed statement supporting its decision, concluding that no further action should take place concerning the Banner sale until such a statement was produced.

On remand, Thompson responded to Friends' appeal with a longer, more detailed statement explaining the basis for the agency's decision. The Chief of the Service again denied discretionary review on March 25, 1995, and Friends again brought suit in the district court.

On September 23, 1994, while the second administrative appeal of the Banner sale was pending, Friends sent a letter to the Forest Supervisor for Medicine Bow, in which Friends requested a supplemental EA or EIS for the Banner site based on alleged "changed circumstances" and "new information." The Forest Service did not respond to this letter. However, the Service did prepare a 26-page Supplemental Information Report (SIR), in which it explained its conclusion that no supplemental EA was necessary. The SIR was issued on October 19, 1995, and was submitted to Friends in connection with this litigation.

On April 25, 1995, Friends filed an amended complaint, which claimed that Thompson's decision on remand was still inadequate under 5 U.S.C. § 555(e). Friends further alleged that the Forest Service's failure to respond to the letter requesting a supplemental EA violated 5 U.S.C. § 555(b), because the Service had not responded within a "reasonable time."

The government filed a motion to require Friends to file a second amended complaint asserting all claims the group intended to assert against the Banner sale, including any challenges to the decision to choose Alternative 2. Friends

consented to the motion, and filed a second amended complaint which contained additional claims alleging that the SIR was a supplemental EA which had not been filed in accordance with notice and comment requirements, and that the decision to implement Alternative 2 violated the NFMA because the service did not consider relevant sustained yield considerations.

Upon cross-motions for summary judgment, the district court granted the government's motion on all claims. Friends now appeals.

## DISCUSSION

### Standard of Review

The district court's decision to grant summary judgment is reviewed de novo. Wolf v. Prudential Ins. Co., 50 F.3d 793, 796 (10th Cir. 1995). However, like the district court, we apply the deferential standards of 5 U.S.C. § 706 in determining whether the agency's action was arbitrary and capricious. Mountain Side Mobile Estates Partnership v. Secretary of Hous. and Urban Dev., 56 F.3d 1243, 1250 (10th Cir. 1995).

# I.

## Was Approval of the Banner Sale "Arbitrary and Capricious"

Friends claims that the Forest Service decision approving the Banner sale was arbitrary and capricious in two respects. First, Friends claims that one of the "key" reasons justifying the decision, i.e., that Alternative 2 provided the highest benefit/cost ratio, was contrary to the evidence before the agency. Second, Friends claims that the Forest Service completely failed to consider sustainable yield principles, and thus did not "consider an important aspect of the problem." State Farm, 463 U.S. at 43.

## A.

## The Evidence Before the Agency

The decision to implement Alternative 2 was consistent with the evidence before the Forest Service at the time the decision was made. Friends' claim is that the alleged higher benefit/cost ratio of Alternative 2 was one of the reasons that alternative was chosen by the Service, and that Alternative 2 did not in fact offer a higher benefit/cost ratio than Alternative 3, which provided for a smaller timber sale. To reach this conclusion, Friends relies on the SIR, which concluded that, after "cruising," Alternative 2 was marginally less beneficial than the uncruised projected figure for Alternative 3.

However, the SIR does not establish substantial changes in the proposed action relevant to environmental concerns, nor does it impugn the decision to select or implement Alternative 2. The SIR only concluded that the ratio for Alternative 2, after cruising, was marginally lower than the pre-cruising estimates for Alternative 3. However, the SIR explained that the Alternative 3 ratios would also likely decrease if cruising were to occur, as Alternative 3 also included a substantial timber sale. Id.[1] Thus, as the district court concluded, Friends is offering figures that are really "apples and oranges." Accordingly, we conclude Friends has offered no evidence that the decision to implement Alternative 2 was contrary to the evidence before the agency.

**B.**

**Alleged Failure to Consider Sustained Yield Issues**

Friends also claims that the Service did not adequately consider sustainable yield principles in deciding to implement Alternative 2, in violation of the NEPA and the NFMA. Thus, Friends contends, the decision was arbitrary and capricious because the agency did not "consider an important aspect of the problem." State Farm, 463 U.S. at 43. We disagree.

---

[1] The SIR did not consider the post-cruising value of Alternative 2 as compared with Alternatives 1 or 4, presumably because the EA found that benefit/cost ratios were inapplicable to those alternatives.

Although the Service does not contend that either the EA or the implementing order discussed sustainable yield issues, the agency notes that under the NFMA, sustained yield issues are addressed in the forest plan. See 16 U.S.C. § 1604(e)(2), 1611 (1994) (requiring agency to address sustained yield issues in forest plan). As an initial matter, we reject the Service's contention that plan-level concerns, such as sustainable yield, may not be considered at the time of an individual sale decision.[2] In this case, Friends has alleged that the ASQ estimates contained in the plan may be high, and that the Service is currently in the process of revising the plan.

However, Friends has not pointed to anything in the administrative record that indicates the 3.1 mmbf sale proposed here implicates sustainable yield concerns. Under the forest plan, the ASQ for Medicine Bow as a whole is 28.4 mmbf per year and the decadal LTSYC is 807.1 mmbf, or 80.7 mmbf on an annualized basis. In 1994, the year the Banner sale was made, the Service only

<hr />

[2]The agency's position on this matter is particularly untenable in light of its consistent litigating position, in cases involving challenges to forest plans, that forest plans may not be challenged at the planning stage, but rather must be challenged at the time of individual implementation decisions. Wilderness Soc'y v. Alcock, 83 F.3d 386, 390-91 (11th Cir. 1996); Idaho Conservation League v. Mumma, 956 F.2d 1508, 1518-19 (9th Cir. 1992). We expressly do not address whether a forest plan may be challenged at the time it is adopted, but note merely that the agency's position that it cannot be challenged at such time strongly suggests that it can be challenged at the time of a particular implementation decision, such as the sale at issue here.

sold 4.7 mmbf in the Forest.  Further, a review of the volume of timber sold from the Medicine Bow National Forest between 1986 and 1995 shows that about 175 mmbf of timber was sold, a total significantly below the 284 mmbf ASQ for the decade.  Indeed, even under the conservative sustainable yield figures cited by Friends, under which the forest can sustain only about 7 mmbf of harvesting annually, the Banner sale did not raise a sustainable yield issue.  Accordingly, the agency did not act in an arbitrary and capricious manner in declining to call into question the forest plan guidelines by raising sustainable yield issues in the Banner sale process.

## II.

### Friends' Request for a Supplemental EA

Friends next argues that the Forest Service violated administrative law principles in refusing to prepare a supplemental EA for the Banner sale.  Under the CEQ regulations, an agency must supplement an EIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40

C.F.R. § 1502.9(c)(1)(i), (ii) (1996).[3] Forest Service rules mandate that supplemental EAs may issue only after a notice and comment period.

As the Supreme Court recognized in Marsh, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." 490 U.S. at 373. Thus, decisions not to supplement an EIS or EA will only be reversed if the agency decision is found to have been arbitrary and capricious. Id. at 376.

Moreover, questions of whether there has been a substantial change in the action, or whether significant new information or circumstances have come to light, are "classic example[s] of . . . factual dispute[s] the resolution of which implicates substantial agency expertise." Id. at 376. The analysis of the relevant information "'requires a high level of technical expertise;'" accordingly, "we must defer to 'the informed discretion of the responsible federal agencies.'" Id. at 377 (quoting Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976)).

---

[3]The Forest Service applies these same principles with respect to EA's, even though the regulations speak only to EIS's. Forest Service Handbook § 18.4, 57 Fed. Reg. 43180, 43200 (1992). Thus, although the CEQ regulations do not speak to the circumstances in which a supplemental EA should be prepared, both the United States and Friends agree that the standards contained in 40 C.F.R. § 1502.9(c)(1) (1996) apply to supplemental EA's, and the district court assumed that was the case as well. D. Ct. Order at 6 n.6.

Friends claims that a supplemental EA was required because: (1) the reduction in timber sale volume at the Banner site revealed through the "cruise" was a substantial change in the action; and (2) significant new information has come to light regarding the timber supply in Medicine Bow. We disagree with both claims.

First, the 55% reduction in sale volume did not constitute a substantial change in the action relevant to environmental concerns. We note that this change would result in a reduction in environmental impact rather than an increase in environmental impact. Although we are not prepared to say that a reduction in the environmental impact of an action can never trigger a requirement to prepare a supplemental EA, we believe that a reduction in environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact. Here, much of the reduction in timber sales volume was the result of implementing the kinds of environmental protections that would normally be expected before cutting begins, such as "cruising."

Further, the SIR supported the Forest Service's conclusion that Alternative 2 was still the most attractive option even after cruising revealed the 55% decrease in available timber. Although Alternative 2's benefit/cost ratio after cruising was marginally lower than that of the pre-cruise figures for Alternative 3,

the Agency explained that the figures for Alternative 3 would likely be lower if cruising were to occur.[4] This conclusion was informed by the agency's substantial expertise in this area. Marsh, 390 U.S. at 376. Thus, we do not believe it was arbitrary and capricious for the agency to conclude that this was not a substantial change.

Nor do we believe the agency was arbitrary and capricious in concluding Friends did not show "significant new circumstances or information" bearing on the environmental implications of the Banner sale. Friends points primarily to the Timber Demand and Supply Study ("TDSS"), an internal Forest Service document prepared by several Forest Service employees for the purpose of assessing timber conditions in Medicine Bow. The TDSS was never completed, and was never formally approved by the agency.

Further, the TDSS was not new because it was abandoned by the Service on March 18, 1992, a full year before the EA was released and the Banner sale consummated. Moreover, the Service explained in detail in the SIR why the TDSS did not contain significant information that would warrant a supplemental EA. In declining to follow the conclusions reached in the TDSS, the Service noted that the study had substantial technical defects, including a failure to take

---

[4]As Alternative 2 was still beneficial after cruising, its benefit/cost ratio continued to exceed those of Alternatives 1 and 4, both of which would have produced no economic benefit.

into account the fact that trees grow in assessing the amount of timber that would be available in the future, as well as the fact that the primary purpose of the document was to make a demand assessment rather than a field-based supply assessment. The TDSS is precisely the sort of document the <u>Marsh</u> Court concluded an agency may discount based on its substantial expertise and subsequent consideration of the relevant issues. <u>Marsh</u>, 490 U.S. at 381 (noting that SIR in that case had adequately addressed concerns raised by environmental group, and concluding that no supplemental EIS was required). Thus, it was not arbitrary and capricious for the agency to decline to supplement the EA based on the TDSS.[5]

### III.

### Forest Service Response to Friends' Administrative Appeal

Friends also contends that, after the district court's remand of the administrative appeal, Forester Thompson's second response to the appeal again failed to respond to issues raised in the appeal, in violation of § 555(e) of the APA. As the district court noted in its remand of the initial appeal, our case law

---

[5]Friends also points to a variety of alleged "new" information. None of this information is new or significant. The Ron Olsen letter merely summarizes the TDSS, and thus is also not significant. The information concerning riparian areas, soils, and old growth forests does not appear to be new, as those issues were thoroughly discussed in the EA.

mandates that agency decisions be "sufficiently detailed that we can determine whether [the agency] considered the relevant factors and that the choice it made based on those factors was a reasonable one." Gillette, 737 F.2d at 886.

Specifically, Friends contends that Forester Thompson's appeal decision of January 31, 1995: (1) did not explain why the agency did not follow the recommendations of certain Forest Service personnel; and (2) failed to explain conflicting statements regarding the visual effects of Alternative 2.

The district court properly rejected this claim. As an initial matter, we agree with the Forest Service regarding the need to consider the administrative record as a whole in considering whether § 555(e) has been satisfied in the NEPA context. Agency decisions in the environmental context are made against a backdrop of extensive documentation due to the NEPA requirements. The government contends that no circuit court has ever remanded a decision to an agency based on § 555(e) in the NEPA context, and we have been unable to locate any such decisions either. In this context, we agree with the Forest Service that the "brief statement" required by § 555(e) cannot adequately assess the basis for an agency decision, and that such statements should be read in light of previous documents prepared to justify the particular decision at issue. Cf. Estate of L.D. French v. FERC, 603 F.2d 1158, 1162 (5th Cir. 1979) (holding that a more "general" statement of basis for agency action is justified where court has before

it a fully documented "record which formed the basis for the [agency's] action"). In this case, the Forest Supervisor's initial decision, as well as the EA itself, fully addressed the concerns raised by Friends.

In any event, we do not believe Friends' concerns are valid. Friends' allegation that the Service ignored the opinions of several Forest Service personnel who opposed Alternative 2 does not really raise a distinct issue from that of why Alternative 2 was chosen over the other alternatives generally, an issue discussed in Thompson's decision, and in the EA and FONSI. In explaining the reason for its choice of Alternative 2, the Service also provided Friends with an adequate explanation as to why it rejected the other alternatives.

As to the visual impacts issue, Friends takes out of context one statement that applied to one portion of the Banner sale, and contrasts it with another statement that was applicable to the sale generally.[6] We conclude that Friends has not shown that the Forest Service's response to its appeal was deficient with respect to visual effects issues.

Taken in context, Forester Thompson's appeal decision of January 31, 1995 provides sufficient detail to satisfy the requirements of § 555(e).

---

[6]The EA stated that Alternative 2 would, as a whole, have positive visual effects, because it would create a more uniform forest. However, the Service noted that in the one portion of the sale involving units 36-39 where 50-70% of trees would be cut, the unaesthetic appearance of some portions of the forest would be exacerbated.

## IV.

### <u>Alleged Failure to Respond to Request for Supplemental EA</u>

Finally, Friends contends that the Forest Service violated the APA in failing to provide a prompt response to Friends' September 23, 1994 letter requesting that the Service conduct a supplemental EA for the Banner sale. Friends claims the agency violated § 555(b) of the APA, which requires that the agency, "within a reasonable time . . . proceed to conclude a matter presented to it."

The government maintains, and the district court agreed, that Friends' letter is not the sort of matter to which § 555(b) applies. There is little case law on this issue. However, we believe there is a substantial argument that § 555(b) does apply to Friends' letter, which is an explicit and colorably valid request for the Service to take action arguably required of it by law to prepare a supplemental EA. First, by its terms, § 555(b) applies to all "matter[s]" presented to the agency. Contrary to the government's position that the provision only applies to "proceedings" in which a person is compelled to appear, the section specifically speaks to "agency proceeding[s]" in which a person is "entitled to appear," as well as "agency function[s]" and "matter[s]," terms which would appear to encompass all forms of agency action. Second, while the government points out that "agency proceedings" only includes the rulemakings, adjudications, and

licensings defined in § 551 of the APA, it fails to acknowledge that § 551 defines "adjudication" as "the formulation of an order," and in turn defines "order" expansively to include the "whole or part of a final disposition . . . other than rule making but including licensing." That section further defines "agency action" broadly to include not only rule makings, licensings, and orders, but also the "failure to act." Id. § 551(13); see also Catron County v. United States Fish & Wildlife Serv., 75 F.3d 1429, 1434 (10th Cir. 1996) (holding that alleged failure to comply with NEPA in designating critical habitat was agency action); Forest Service Handbook § 18.1, 57 Fed. Reg. 43180, 43200 (1992). Thus, we assume, for the purposes of this opinion, that § 555(b) applies to the letter.

Nonetheless, even assuming § 555(b) applies to Friends' letter, the agency's response to the letter substantially complied with the requirements of the section, as well as with the "brief statement" requirement of § 555(e). Friends does not dispute that the SIR is an adequate "brief statement" of the agency's reasons for not conducting a supplemental EA. Thus, the only question is whether the SIR was issued within a "reasonable time" as is required by § 555(b).

Friends has not pointed to a single case in which a court has reversed an agency action under § 555(b) for failure to comply with the "reasonable time" requirements. But cf. NLRB v. Mountain Country Food Store, Inc., 931 F.2d 21 (8th Cir. 1991) (refusal to enforce stale NLRB order that was delayed six years

when circumstances had changed dramatically and it would no longer be equitable to enforce the order). More typically, courts have occasionally granted mandamus to force agencies to act when there has been no response to a request for agency action. See, e.g., Litton Microwave Cooking Prods. v. NLRB, 949 F.2d 249, 253 (8th Cir. 1991) (recognizing that mandamus may issue in that situation); Nader v. FCC, 520 F.2d 182, 206 (D.C. Cir. 1975) (recognizing authority to compel agency action in same situation). But, in this case, the agency did act, by issuing the SIR. In cases where agencies acted, courts have declined to overturn agency action on the basis of the delay in situations where the agency took much longer to respond than the approximately one year period at issue here, particularly where as here the party opposing the action benefitted from the delay. See, e.g., NLRB v. Hanna Boys Center, 940 F.2d 1295, 1299 (9th Cir. 1991) (six year delay and party challenging action benefitted from the delay); see also In re City of Virginia Beach, 42 F.3d 881, 885-86 (4th Cir. 1994) (refusing to mandamus agency to act despite four year delay in preparing EIS). Accordingly, we conclude the agency acted within a reasonable time in producing the SIR, particularly in light of the lengthy, detailed nature of Friends' request for action, and the thoroughness of the agency's eventual response.

Finally, we conclude that Friends is not a "prevailing party," and thus is not entitled to fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994 & Supp. 1997).

## CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court.