**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 25 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

ALFRED G.  HOYL,

      Plaintiff-Appellant,

v.

BRUCE BABBITT, Secretary,
Department of the Interior,

      Defendant-Appellee.

No.  96-1388

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No.  93-B-988)

---

Constance E. Brooks (Diane Vaksdal Smith of C.E. Brooks and Associates, P.C., and
James F. Engelking of James F. Engelking, P.C., Denver, Colorado, with her on the
brief), of C.E. Brooks and Associates, P.C., Denver, Colorado, for Plaintiff-Appellant.

Ellen J. Durkee (Lois J. Schiffer, Assistant Attorney General, Environment and Natural
Resources Division and David C. Shilton, United States Department of Justice,
Environment and Natural Resources Division, Washington, D.C., Henry J. Solano, United
States Attorney and Robert D. Clark, Assistant United States Attorney, Denver, Colorado,
and Lyle K. Rising, Office of the Solicitor, Rocky Mountain Region, Department of
Interior, Lakewood, Colorado, with her on the brief), United States Department of Justice,
Environment and Natural Resources Division, Washington, D.C., for Defendant-
Appellee.

---

Before PORFILIO, ANDERSON, and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

Plaintiff Alfred G. Hoyl appeals the district court's order affirming the Department of Interior, Bureau of Land Management's (BLM's) denial of his request for a coal lease suspension pursuant to § 39 of the Mineral Leasing Act. 30 U.S.C. § 209. As grounds for reversal, Plaintiff asserts that: 1) the district court's findings of fact are not supported by substantial evidence; 2) the district court erred by affirming the BLM's denial of his request for a coal lease suspension because "the denial differed significantly from past agency precedent;" 3) the district court erred by holding that a present market for coal, actual coal lease production, and authorization to mine are prerequisites for a § 39 suspension; and 4) the district court erred in finding that Plaintiff was not denied due process when the Interior Board of Land Appeals (IBLA) refused his request for an evidentiary hearing. Our jurisdiction arises under 28 U.S.C. § 1291. We affirm.

I.

In 1920, Congress authorized the Secretary of Interior to lease federal mineral properties to private parties. 30 U.S.C. § 181. Congress authorized the Secretary to issue prospecting permits to qualified applicants. Pursuant to the terms of the prospecting permits, once the applicant discovered coal on the lands covered by the permit and proved its existence to the Secretary, the applicant's prospecting permits ripened into preference

2

right lease applications (PRLAs). Thereafter, if the holder of the PRLAs proved that coal existed in commercial quantities, the Secretary would issue federal coal leases to the applicant. Under this system, a few large companies controlled the vast majority of federal coal deposits and large tracts of federal coal lands remained idle.

Concerned, among other things, about speculative holding of federal coal leases, Congress passed the Federal Coal Leasing Amendments Act (FCLAA), 30 U.S.C. §§ 201-209. In doing so, Congress created a "diligent development" requirement which forced lessees to produce coal from their leases in "commercial quantities"[1] within ten years of lease issuance. Thus, if a lessee fails to produce coal in commercial quantities within ten years of lease issuance, the lease lapses. Under the amended Mineral Leasing Act, a federal coal lease may be suspended[2]: (1) under § 7(b) if lease development is halted by a *force majeure*, 30 U.S.C. § 207(b); or (2) under § 39 "for the purpose of encouraging the greatest ultimate recovery of coal . . . and in the interest of conservation of natural resources." 30 U.S.C. § 209.

A § 39 suspension is generally appropriate where the Secretary has taken action which prohibits the lessee from having timely access to the lease or where the lessee requests a suspension in the interest of conserving natural resources. When the Secretary

---

[1] "Commercial quantities" is defined as one percent of recoverable coal reserves or logical mining unit recoverable reserves. 43 C.F.R. § 3480.0-5(a)(6).

[2] A § 39 suspension tolls the ten-year diligent development period for the length of time the lease is suspended.

3

prevents timely access to the lease, a *de facto* suspension occurs to which the lessee is entitled as a matter of right. Copper Valley Machine Works, Inc., v. Andrus, 653 F.2d 595, 602-605 (D.C. Cir. 1981). Where the Secretary, through some affirmative action, prevents a lessee from accessing and developing his federal coal lease, the lessee should not be penalized by having that time count against his due diligence period. Id. at 602-03 (*citing* H.R. Rep. No. 1737, 72d Cong., 1st Sess. 2-3 (1932); 76 Cong. Rec. 705, 1881 (1932)(remarks of Representative Eaton)).

When a lessee requests a suspension on the basis of conservation of natural resources, however, the matter is committed to agency discretion. Copper Valley, 653 F.2d at 604 (implying that agency's decision to grant suspension in the interest of conserving natural resources is discretionary.). Section 39 is an equitable provision. Accordingly, the courts and the Department of Interior have liberally construed the phrase "in the interest of conservation of natural resources" to not only encompass conserving mineral deposits, but also to prevent environmental harm. Id. at 600; Stephen G. Moore, 111 IBLA 326, 329 (1989). With this background in mind, we proceed to the present appeal.

## II.

On October 1, 1966, Gerald Tresner obtained permits allowing him to prospect for coal on certain federal lands north of Fruita, Colorado. Tresner discovered coal, and as a result received three PRLAs for the lands covered by the prospecting permits. In order

4

for the PRLAs to become actual coal leases, Tresner had to prove that coal existed in commercially viable quantities.

Plaintiff and Donald E. Wilde owned fee land containing coal outcroppings next to Tresner's PRLAs. To prove his PRLAs were commercially viable, Tresner entered into an agreement with Plaintiff and Wilde to mine their adjacent fee land. Plaintiff submitted a mine plan to the United States Geological Service, which approved the plan on July 23, 1977. Plaintiff, Tresner, and Wilde then contracted with Dorchester Coal Company which mined the fee land up to the boundary between the fee land and the PRLAs. After completing the fee land mining, Tresner assigned the PRLAs to Dorchester. The BLM, apparently satisfied that the PRLAs were commercially viable, issued three separate leases to Dorchester on July 1, 1981, thus beginning the ten-year diligent development period. Plaintiff, Wilde, and Tresner retained royalty interests in the leases.

Between 1981 and 1983, exploratory operations on the three leases suggested that each of the leases could be mined as a single independent operation. Based on this information, Dorchester submitted separate mine plans for each lease to the Office of Surface and Mining (OSM) and the Mined Land Reclamation Division (MLRD). The agencies determined that the submitted plans were deficient, and requested more information from Dorchester on March 15, June 13 and October 29, 1984. Dorchester responded to the agency's request on July 2, 1985, but the record suggests that the

5

response was insufficient. Awaiting the information, the agencies took no further action on Dorchester's applications.

In 1986, American Shield Coal Company became the owner of the leases after its parent company acquired Dorchester's parent company. American Shield acknowledged the problems with the mine plans submitted by Dorchester and informed the cooperating agencies that "[w]e expect to supply fully engineered responses to the outstanding adequacy issues for all three leases within ninety days." By 1988, however, American Shield had not supplied the necessary information. In fact, the company notified the BLM that because of a poor coal market, it was withdrawing the permits and would not proceed with development of the leases. Thereafter, American Shield failed to post the bonds required by the BLM. The agency notified American Shield of the default and warned that failure to cure would result in the federal leases being canceled.

Aware of American Shield's action (or inaction) regarding the leases, Plaintiff became concerned with the fate of his royalty interest in the leases. Accordingly, he met with BLM officials to discuss the options available to protect his interests. The record suggests that the BLM and Plaintiff decided Plaintiff could assume the leases from American Shield, cure the defaults, and seek a suspension of the lease until Interior could conduct an environmental impact statement and Plaintiff could complete the necessary mine permits. Although BLM officials made no guarantees, the record suggests that, at a

minimum, they expressed optimism that the suspension would be granted.[3]  Furthermore, both the BLM and Plaintiff apparently knew that it would be impossible to bring the leases into production before the diligent development deadline in the absence of a suspension.

On April 3, 1989, Plaintiff requested that BLM transfer title to the leases to him. Shortly thereafter, on April 6, 1989, he requested a suspension of the lease under §§ 39 and 7(b) of the Mineral Leasing Act.  30 U.S.C. §§ 207(b) & 209.  BLM notified Plaintiff that he was responsible for surety bonds to guarantee annual rental payments and an additional $50,000 cash reclamation bond.  After several requests for extensions, Plaintiff met BLM's bonding requirements on December 20, 1989.  BLM then processed Plaintiff's application requesting transfer of the leases and on January 1, 1990 transferred the leases to Plaintiff and Wilde.  On January 22, 1990, BLM notified Plaintiff that it was reviewing his application for lease suspensions under §§ 39 and 7(b) of the Mineral Leasing Act.  BLM issued its decision denying plaintiff's suspension request on August 21, 1990.

---

[3]     Plaintiff's brief emphasizes his belief that BLM viewed him as a means to recoup past due rentals owed by American Shield.  Although BLM made no promises to Plaintiff, we are cognizant that the agency's actions in this case leave much to be desired. By going beyond merely advising him of options, to expressing optimism regarding future action, the agency gave Plaintiff a false sense of security which was later shattered by the denial of his suspension request.  This type of action on the part of a federal agency serves no productive purpose and tends only to undermine the perceived legitimacy of the agency's decisions.

BLM offered several reasons for the denial. First, BLM concluded that even if the suspension were granted, that Plaintiff's proposed mine plan would not enable him to meet the diligent development requirement. Second, BLM stated that to qualify for a suspension, a lessee must have authorization to mine and current development on the mine site. Finally, BLM concluded that the policies behind § 39 would not be thwarted by denying the suspension because no federal coal would be lost if the suspension were denied.

Plaintiff appealed BLM's decision to the IBLA. The IBLA affirmed. Plaintiff then moved for reconsideration on the grounds that: (1) BLM's denial of his request for a suspension was inconsistent with the decision in Trapper Mining, Inc., 103 IBLA 366 (1988); (2) BLM's administrative delays deprived him of beneficial use of the leases; and (3) BLM was estopped from denying the suspension because he relied on its assurances that the suspension would be granted. The IBLA rejected Plaintiff's arguments and reaffirmed its earlier decision. Subsequently, the ten year diligent development period expired and BLM notified Plaintiff that his leases were canceled. IBLA affirmed the cancellation.

On May 7, 1993, Plaintiff sought review of the IBLA's decision in the district court pursuant to the Administrative Procedures Act, 5 U.S.C. § 701. Plaintiff argued that BLM arbitrarily and capriciously denied his application for suspension of operations

8

under § 39 of the Mineral Leasing Act. In a thorough opinion, the district court rejected Plaintiff's arguments and affirmed the decision to deny the § 39 suspension.

III.

Although Plaintiff and the government allude to the Administrative Procedures Act in their briefs, neither party attempts to guide the Court through its strictures. Instead, the parties spend a good deal of time name calling, arguing over the record and IBLA precedent, and making conclusory statements regarding the factors properly considered in granting a § 39 suspension. Our review of agency decisions is guided by the APA. Accordingly, we begin our analysis by examining the statute.

The APA provides for judicial review of a final agency action. 5 U.S.C. § 702. The scope of this review, however, is limited. McAlpine v. United States, 112 F.3d 1429, 1432 (10th Cir. 1997). The IBLA's decision represents the final agency action in this case. 43 C.F.R. § 4.403. Our review of the IBLA's decision is de novo, in that, we accord no deference to the district court's decision. City of Albuquerque v. Browner, 97 F.3d 415, 424 (10th Cir. 1996) However, based on the administrative record, we apply a deferential standard and will set aside the decision only if it is arbitrary, capricious, otherwise not in accordance with the law, or not supported by substantial evidence. Chipman v. Shalala, 90 F.3d 421, 422 (10th Cir. 1996).

9

## A.

Plaintiff's first argument on appeal is that the district court's decision affirming the BLM's denial of a § 39 suspension is not supported by substantial evidence. Specifically, Plaintiff suggests that the record contradicts the district court's findings of fact, and that had the district court conducted a plenary review of the record and not relied solely on the government's representations, it would have reversed the BLM's decision. We disagree.

Evidence is generally substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual conclusion. Rapp v. Office of Thrift Supervision, 52 F.3d 1510, 1515 (10th Cir. 1995). We have further defined substantial evidence as "such relevant evidence a reasonable person would deem adequate to support the ultimate conclusion." Grubb v. Federal Deposit Insurance Corp., 34 F.3d 956, 961 (10th Cir. 1994). Although our inquiry into the record is careful and searching, we may not substitute our own judgment for that of the agency. McAlpine, 112 F.3d at 1436. Thus, even though we may not agree with the agency's ultimate findings, we will not set them aside if they are supported by substantial evidence.

Plaintiff contends that the district court affirmed four determinative findings of fact which are clearly contradictory to the record. First, Plaintiff disputes the IBLA's finding that the "previous lessee filed mine plan permit applications which were seriously deficient, which were never corrected, and which were withdrawn." Second, Plaintiff claims the record contradicts the IBLA's finding that no mine plan was approved due to

his predecessor's lack of diligence. Third, Plaintiff complains that the IBLA erroneously found that the facts of Consolidation Coal Co., 111 IBLA 381 (1989) and his case were distinguishable. Finally, Plaintiff contests the IBLA's finding that he would need access to the leases for all or most of the period of the requested suspension.[4] We have thoroughly reviewed the administrative record before us and conclude that IBLA's findings of fact are supported by substantial evidence.

B.

Plaintiff next complains that Interior acted arbitrarily and capriciously in not granting his request for a § 39 suspension because the statute and established agency precedent mandate a suspension as a matter of right whenever the agency prepares an environmental impact statement (EIS). Specifically, Plaintiff claims that § 39, as interpreted by the court in Copper Valley Machine Works, Inc., v. Andrus, 653 F.2d 595, 602-605 (D.C. Cir. 1981), entitled him to a suspension as a matter of right because Interior had to prepare an EIS before he or his predecessors could develop the coal leases. Furthermore, he complains that Interior's decision to deny his request is directly contrary to agency precedent holding that Interior grants § 39 suspensions as a matter of policy when the agency prepares an EIS.

---

[4]     Our review of the IBLA's decisions in this case revealed no finding that Plaintiff would need access to the leases for most of the suspension period. Regardless, the record before us contains substantial evidence supporting such a finding.

Plaintiff notes that an agency must prepare an EIS before a lessee may conduct mining operations on a federal coal lease, 40 C.F.R. § 1508.18(b)(4), and that a lessee cannot access or develop the lease until the EIS is completed. He argues that the EIS requirement is analogous to the stipulations at issue in Copper Valley. Therefore, he asserts that he is entitled to a § 39 suspension as a matter of right. We disagree.

In Copper Valley, the lessee held a federal oil and gas lease in an area of Alaska that was particularly fragile and susceptible to environmental degradation during the summer thaw. Accordingly, BLM placed stipulations in the lessee's application for permit to drill which prevented any activity on the lease during the six months of summer thaw. The lessee attempted to develop the lease with two years remaining in the diligent development period. However, because of the stipulations, activity on the lease could only occur six months out of the year. The court held that when the Secretary's actions prevent a lessee from accessing and developing his federal oil and gas lease, the action creates a *de facto* suspension under § 39. Copper Valley, 653 F.2d at 605. Importantly, the court noted that Congress intended for § 39 to be applied uniformly to all federal mineral lessees and that the stipulations imposed upon the lessee were not required of lessees with federal oil and gas leases in other areas. Id. at 604. Thus, to let the clock run on the lessee's diligent development period while the government prevented access to the

lease would be fundamentally unfair and contrary to § 39's policy that all lessees have ten years to satisfy the diligent development requirement. Id. at 602-604.

Plaintiff ignores the fact that an EIS is prepared in the ordinary course of developing a federal coal lease. Under Plaintiff's interpretation of Copper Valley, Interior would be required to issue a lease suspension every time preparation of an EIS is necessary. Such a broad construction, however, is contrary to the policies of § 39 and the FCLAA. Interior has determined that § 39 suspensions are generally only appropriate in "extraordinary" situations where a lessee is denied access to his lease. E.g. Koch Exploration Co., 100 IBLA 352, 363 (1988). This interpretation is consistent with Copper Valley's recognition that § 39 is an equitable provision which prevents a lease from lapsing for lack of diligent development when the Secretary takes action regarding a lease which does not apply evenhandedly to leases in other areas. As Plaintiff readily admits, an EIS must be prepared before a coal mine may be developed. This applies not just to selected federal coal leases, but to all federal coal leases. Logically, this makes the preparation of an EIS part of the ordinary course of developing a coal mine. Allowing a suspension to issue while ordinary mine development activities occur is not consistent with the purposes behind § 39.

This is not to say that delays caused by the agency during the preparation of an EIS could never entitle a lessee to a suspension. An agency preparing an EIS must do so diligently and without undue delay. Certainly, an agency could delay in preparing an EIS

13

to the extent that a § 39 suspension would be necessary to carry out the policies of the Mineral Leasing Act and the FCLAA. Indeed, an agency preparing an EIS might encounter unexpected difficulties which cause an unreasonable delay. In such a situation, the agency could easily abuse its discretion by not granting the suspension. Conversely, the equitable policies surrounding § 39 would be thwarted if a suspension were granted where the delays in preparing the EIS were attributable to the lessee and not the agency. This determination, however, must be based on a careful consideration of relevant factors and made on a case by case basis. Thus, although undue delay may require an agency to exercise its discretion and grant a suspension, we conclude that the mere preparation of an EIS does not constitute a *de facto* lease suspension under § 39.

2.

Plaintiff next argues that Interior departed from well established agency precedent by failing to grant a suspension during the preparation of the EIS. We agree with Plaintiff that an agency acts arbitrarily and capriciously when its actions depart from well established agency precedent without a reasoned explanation. Diaz-Resendez v. Immigration and Naturalization Service, 960 F.2d 493, 495 (5th Cir. 1992); Graphic Communications International v. Salem-Gravure, 843 F.2d 1490, 1493 (D.C. Cir. 1988). We disagree, however, that Department of Interior precedent establishes a policy of granting § 39 suspensions whenever the agency is required to conduct environmental studies or prepare an environmental impact statement.

14

Undoubtedly, Interior has granted § 39 suspensions in situations where it prepared an environmental impact statement. E.g., Stephen G. Moore, 111 IBLA 326 (1989). However, we are not convinced that by issuing the decisions, Interior abrogated its discretion to deny future requests where an EIS was being prepared. Indeed, the decisions demonstrate that the agency issued the suspensions in the exercise of its discretion and not as a matter of right. See Mobil Producing Texas & New Mexico, Inc., 99 IBLA 5, 8 (1987) (department *may* suspend a lease in the interest of conservation where action cannot be taken on an application because of time needed to comply with the requirements of the National Environmental Policy Act) (emphasis added); See also Stephen G. Moore, 111 IBLA at 329; Nevdak Oil & Exploration, Inc., 104 IBLA 133, 138 (1988). Accordingly, Interior did not depart from well established agency precedent when it refused to grant Plaintiff's request for a § 39 suspension.

C.

Plaintiff next argues that we must set aside the Interior's denial of his request for a suspension because the basis for the agency's decision is contrary to § 39 and the agency's own rules. Specifically, Plaintiff argues that IBLA erroneously held that a present market for coal, actual coal lease production, and authorization to mine are required before a § 39 suspension may be granted. While we generally agree that the above three factors are not prerequisites to granting a § 39 suspension, we believe Plaintiff misstates IBLA's holding.

15

When we review an agency's application of a statute where Congress has clearly spoken to the issue before us, we must give effect to the unambiguous intent of Congress. Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984). However, where Congress is silent regarding the issue before us, and has delegated authority over the subject matter to the agency construing the statute, we will defer to the agency's construction. Id. at 843-44. We will set aside the agency's interpretation only if, in the context of the statute, the agency's construction is unreasonable or impermissible. Id. at 843, 845. We apply this level of deference only when the agency's interpretation is reached through formal rulemaking procedures or an adjudication. Headrick v. Rockwell Int'l Corp., 24 F.3d 1272, 1282 (10th Cir. 1994).

Aside from stating the general propositions that a suspension must "[be] in the interest of conservation of natural resources" and "for the purpose of encouraging the greatest ultimate recovery of coal," § 39 provides the Secretary no guidance as to the factors properly considered in determining whether or not to grant a lease suspension. Because the statute explicitly delegates authority over the issuance of lease suspensions to the Secretary, we must determine whether the factors Plaintiff claims Interior erroneously considered in denying his suspension request are permissible or reasonable constructions of § 39.

1.

Plaintiff first contends that Interior acted arbitrarily and capriciously by requiring him to show a present market for the coal he planned to extract from his federal leases. Plaintiff mischaracterizes IBLA's holding. The IBLA considered the lack of a present market for Plaintiff's coal when it affirmed the BLM's denial of Plaintiff's suspension request. However, the Board explicitly noted that it merely considered the lack of a market as a factor when exercising its discretion under § 39 and that the lack of a market is not, by itself, dispositive. The Board explained that it considered the existence of a coal market in order to determine that the lessee's request for suspension was in good faith and not for speculative purposes. Interior's consideration of a present market for coal as a factor in determining whether or not to grant Plaintiff's request for a suspension was reasonable. Thus, we accord <u>Chevron</u> deference to Interior's interpretation of § 39, and conclude the agency properly considered the existence of a present market for coal when it denied Plaintiff's suspension request.[5]

---

[5] At oral argument, the Secretary argued that where Interior suspected that a lessee's suspension request is motivated by a poor coal market, the lessee *must* prove the existence of a present market before the agency will grant a § 39 suspension. While we conclude the Secretary may consider the existence of a coal market in determining whether to grant a suspension, we reject the Secretary's position that his subjective suspicion that a lessee's request for a suspension is motivated by a poor coal market makes the existence of a market mandatory before a suspension may be granted.

17

2.

Plaintiff complains that the IBLA erred by requiring him to show actual production from his federal leases before it could grant a § 39 suspension. Although the district court considered the lack of production on Plaintiff's leases when it affirmed the IBLA's decision denying Plaintiff's request for a suspension, neither BLM nor the IBLA relied on lack of production in their denial of Plaintiff's requested suspension. Our review is limited to the administrative record and we give no deference to the district court's decision. Because we conclude that whether and to what extent Interior may appropriately consider lack of production is not properly before us, we do not decide the issue.

3.

Plaintiff also contends that the IBLA acted arbitrarily and capriciously when it denied his request for a suspension because he lacked authorization to mine. In particular, Plaintiff complains that Interior erroneously determined that authorization to mine is a prerequisite to obtaining a suspension under § 39. The IBLA's decision indicates that it considered Plaintiff's lack of authorization to mine in affirming the denial of his request for a suspension. However, its language does not suggest that authorization is mandatory in order to receive a § 39 suspension. Indeed, the Board clearly stated that it considers many factors in determining whether to grant a suspension. Interior's consideration of whether Plaintiff was authorized to mine his federal leases was

18

reasonable. Thus, we accord <u>Chevron</u> deference to the agency's interpretation of § 39, and conclude that the agency did not act arbitrarily and capriciously when it considered whether Plaintiff had received authorization to mine his leases.

D.

Finally, Plaintiff argues that the IBLA violated his procedural due process rights and its own rules by not providing him a formal evidentiary hearing. Specifically, Plaintiff argues that because he had a property interest in the federal coal leases, he was entitled to a formal evidentiary hearing regarding the leases suspensions. Plaintiff further argues that the IBLA's failure to grant him a hearing regarding the suspension violated its own rules. We disagree.

The BLM's action regarding Plaintiff's request for a § 39 suspension undoubtedly affected his property rights in the three federal coal leases. We need not decide, however, whether Plaintiff had a protected property interest in a § 39 suspension, because even assuming Plaintiff had a right to due process regarding the suspension, the process afforded by the IBLA and later by the district court satisfies any such right. The IBLA allowed Plaintiff to present argument and evidence in written form. Furthermore, after the IBLA ruled against him, the district court conducted a de novo review of the agency's decision. Accordingly, the procedural protections provided to Plaintiff satisfy his due process rights. <u>Haskell v. United States Dept. of Agriculture</u>, 930 F.2d 816, 819-820 (10th Cir. 1991); <u>Clouser v. Espy</u>, 42 F.3d 1522, 1540 (9th Cir. 1994). We also note that

19

the IBLA's authority to grant a formal hearing before the Board pursuant to 43 C.F.R. § 4.415 is purely discretionary. Therefore, the IBLA did not violate its own rules when it ruled on the written evidence before it and denied Plaintiff's request for a formal hearing.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.