UTAH SHARED ACCESS ALLIANCE,
and Anthony Chatterley,
Plaintiffs,

v.

Mary WAGNER, in her official capacity as Acting Forest Supervisor of Dixie National Forest; and The United States Forest Service, Defendants,

and

Southern Utah Wilderness Alliance, The Wilderness Society, American Lands Alliance, the Utah Chapter of the Sierra Club, the Great Old Broads for Wilderness, Wildlands CPR, and John Galland, Defendant–Intervenors,

No. 2:99CV0349C.

United States District Court,
D. Utah,
Central Division.

June 8, 2000.

Hal J. Pos, Salt Lake City, UT, for plaintiffs.

Stephen L. Roth, Salt Lake City, UT, for defendants.

## ORDER

CAMPBELL, District Judge.

This case concerns the Environmental Assessment ("EA") for the Boulder Top Watershed and Fisheries Restoration Project and subsequent Decision Notice and Finding of No Significant Impact ("FONSI"). The EA finalized the decision of the Defendant Forest Service to close 89 miles (or 68%) of the roads in the Boulder Top area, thus reducing the total mileage of roads open to motorized use from 132 to 42 miles. (*See* Administrative Record at 000150) ("AR").

Utah Shared Access Alliance ("USA–ALL") and Anthony Chatterley ("Plaintiffs") allege that Mary Wagner, Supervisor of the Dixie National Forest, and the United States Forest Service ("Defendants") violated the National Environmental Policy Act, 42 U.S.C. § 4331, et seq. ("NEPA"), the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Administrative Procedures Act, 5 U.S.C. § 551, et seq. ("APA"). The Southern Utah Wilderness Alliance, the Wilderness Society, American Lands Alliance, the Sierra Club, the Great Old Broads for Wilderness, Wildlands CPR, and John Galland ("Defendant–In-

tervenors") intervened on October 28, 1999.

All three groups of parties have filed motions for summary judgment. With few exceptions, all the parties raise the same issues. The court conducted a hearing on the three motions for summary judgment on May 19, 2000. Having fully considered the arguments of counsel, the submissions of the parties, and applicable legal authority, the court now enters the following order.

## Background

Boulder Top is a 50,000 acre plateau on top of Boulder Mountain, located in the Dixie National Forest, Teasdale Ranger District, near Teasdale, Utah. The Boulder Top area is interspersed with several lakes and forest areas and is a popular recreation destination, used for fishing, hiking, and camping. Boulder Top is managed by the Defendant United States Forest Service.

The Boulder Top area contains approximately 132 miles of vehicular routes, most of which are user-created trails and vehicle two-tracks (nearly 99 miles). (*See* EA at 3–1, AR at 7020.) Very little (if any) maintenance has been conducted on these user-created trails. (*See* EA at 3–2, AR at 7021.)

In the early 1980's, Utah Department of Wildlife Resource ("UDWR") fisheries biologists realized that many of the lakes on Boulder Top were being impacted by sediment. (*See* EA at 3–8, AR at 7027.) Specifically, UDWR staff noted that many of the lakes which had traditionally supported overwintering populations of trout were becoming shallower, and as a result, winter kill of trout was becoming more prevalent. (*See* AR at 004606.) According to the biologists, "[m]uch of [the sediment increase could be] attributed to poorly lo-

cated, constructed or improperly drained roads." (EA at 3–8, AR at 7027.)

On June 3, 1997, Defendant Forest Service published the EA for the Boulder Top Watershed and Fisheries Restoration Project for the stated purpose of initiating action on Boulder Top to improve watershed conditions, fish habitats in several lakes, and various problems resulting from unplanned or poorly located roads. (*See* AR at 000520.) On January 12, 1998, the Forest Service published a second Decision Notice and FONSI, proposing to close 89 miles of roads on Boulder Top to motorized use. (*See id.* at 000151.)

Plaintiffs argue that summary judgment should be granted in their favor on all claims.[1] Specifically, Plaintiffs argue that the court should decide as a matter of law that the Defendants (1) violated NEPA by (a) failing to prepare an Environmental Impact Statement ("EIS") for a major federal action that will significantly affect the quality of the human environment, and (b) failing to take a "hard look" at the potential environmental consequences of the proposed alternative by basing the EA and FONSI on unsound scientific assumptions; (2) violated the Rehabilitation Act by closing roads on public lands to motorized vehicular travel, thereby denying access to those lands to people with certain physical disabilities; and (3) violated the APA by taking actions that are arbitrary, capricious, and otherwise not in accordance with the law. Defendants and Defendant–Intervenors move for summary judgment in their favor on all claims.

## Discussion

### A. NEPA Claims

#### 1. Standing Issues

■ The Defendants argue that Plaintiffs have no standing to bring an action under NEPA. Standing is a threshold jurisdictional question that the court must

---

1. During oral argument, Plaintiffs admitted that they have abandoned their claim of violation of NEPA based on a failure to provide a meaningful opportunity for public comment during the environmental review process. This claim is, therefore, dismissed without discussion.

decide before it may consider the merits of a case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). When a defendant moves for summary judgment based on a lack of standing, a plaintiff can not rest on the mere allegations in a complaint. *See* Fed.R.Civ.P. 56(e). Instead, the plaintiff must set forth "by affidavit or other evidence, 'specific facts' showing there is a genuine issue for trial." *Committee to Save Rio Hondo v. Lucero*, 102 F.3d 445, 450 (10th Cir.1996) (internal citations omitted).

The concept of standing includes both a constitutional dimension as well as certain prudential limits. *See Valley Forge College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Defendants argue that Plaintiffs have failed to demonstrate both constitutional and prudential "zone of interest" standing.

### i. Constitutional Standing

Constitutionally-mandated standing requirement contains three requirements:

█ there must be alleged (and ultimately proven) an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and actual or imminent, not "conjectural" or "hypothetical"; [2] there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant; and [3] there must be redressability—a likelihood that the requested relief will redress the alleged injury.

*Citizens for a Better Env't*, 523 U.S. at 103, 118 S.Ct. 1003 (internal quotations and citations omitted). The parties focus on the first element of constitutional standing: whether Plaintiffs have alleged an injury in fact.

In *Rio Hondo*, the Tenth Circuit addressed the issue of the injury in fact in a similar procedural setting. According to the Tenth Circuit,

the injury in fact prong of the standing test of Article III breaks down into two parts: (1) the litigant must show that in making its decision without following the NEPA's procedures, the agency created an *increased risk of actual, threatened, or imminent environmental harm;* and (2) the litigant must show that the increased risk of environmental harm injures its *concrete interests* by demonstrating either its geographical nexus to, or actual use of the site of the agency action.

*Id.* at 449 (emphasis added).

### a. Increased Risk of Environmental Harm

The *Rio Hondo* decision makes clear that the increased risk of harm prong must be *environmental* in nature. *See id.* In that case, the Tenth Circuit considered an action challenging the Forest Service's decision to allow summer use of a ski area in a national forest. In analyzing the issue of standing, the court found an increased risk of environmental harm because the plaintiff had alleged (in affidavit form) that the agency action would affect (1) "summertime use of the Ski Area [resulting] in increased river water consumption"; (2) "the quality of the river by increasing sewage discharge and non-point source pollution from increased vehicle travel, silt, and industrial fluids from the Ski Area's mechanical operations"; and (3) "the recreational and aesthetic value of the land in and around the Ski Area because summertime use of the Ski Area increases development and mechanization." *Id.* at 450.

█ In this case, Defendants argue that Plaintiffs lack standing since the complaint alleges only a non-environmental interest (i.e., vehicular access to roads on Boulder Top) and fails to allege any non-pretextual environmental injury. This is clearly true when looking at the complaint itself, which focuses on the closure of roads at Bolder Top, without reference to any alleged environmental injury. However, Plaintiffs clarify their position in a declaration of

Brian D. Hawthorne, Executive Director for USA–ALL. According to Hawthorne, the organization would suffer an increased risk of environmental harm due to the agency action:

> USA–ALL, ... expressed its concern that the [EA] did not adequately study the effect that additional silting caused by the road obliteration and building process would have on the lakes on Boulder Top. Furthermore, ... the revised decision might actually exacerbate the siltation problem on Boulder Top and cause additional environmental harm, rather than improving the environment.

(*See* Hawthorne Decl. at 3, attached as Ex. A to Pls.' Reply Mem.) [2] These facts are sufficient to establish that USA–ALL suffer a threatened increased risk of environmental harm due to the Defendants' alleged failure to follow NEPA procedures.

However, Anthony Chatterley, added as a plaintiff in an amended complaint, has failed to establish that be will suffer an increased risk of environmental harm, and therefore has failed to demonstrate standing. Chatterley is described as "a frequent recreational user of the public lands in Southern Utah, including Boulder Top." (Am.Compl. at 4.) According to the allegations in the complaint, since Chatterley is physically disabled, "any prohibition on the use of motorized vehicles in those areas would effectively deny [him] access to and benefits of those public lands and facilities." (*Id.*) Chatterley, however, has provided no affidavit or other evidence setting forth any evidence that he would be harmed by Defendants' actions. *See* Fed. R.Civ.P. 56(e) ("[A]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings....").

### b. Concrete Interests

■ Constitutional injury in fact requires the litigant to show that the increased risk of environmental harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action. *See Rio Hondo*, 102 F.3d at 449. According to the complaint and Hawthorne's declaration, "USA–ALL members use motorized vehicles, including off-highway vehicles (OHVs), within the Boulder Top area of the Dixie National Forest." (Am.Compl. at 3–4; Hawthorne Decl. at 2.) Hawthorne makes clear that the potential injury is personal to USA–ALL, since the intent of the organization is to "defend equality of shared access, educate the public, and empower user groups *while conserving our public lands for the benefit of all.*" (Hawthorne Decl. at 2) (emphasis added.) Therefore USA–ALL has established that its concrete interests are threatened such that it has the right to ensure that Defendants follow NEPA procedures.[3]

---

**2.** As noted above, when a defendant moves for summary judgment based on a lack of standing, a plaintiff can not rest on the mere allegations in a complaint but must set forth "by affidavit or other evidence, 'specific facts' showing there is a genuine issue for trial." *Rio Hondo*, 102 F.3d at 450. Although not evidentiary in nature, Plaintiffs' pleadings further explain their environmental concerns:

> Assuming the same number of visitors will travel Boulder Top in motorized vehicles, the traffic density on the open roads can be expected to more than triple. Additionally, these road closures will terminate vehicular access to [a number of lakes and areas]. This will leave [only three lakes] as the only stocked fishable lake to remain open on Boulder Top. (AR at 000157.) Defendants are well aware of and fully expect increased

> pressures from human impact on the areas that will remain open.
> Nonetheless, Defendants failed to consider the significant indirect environmental effects that this increased pressure will have on Boulder Top and to prepare an EIS to comprehensively analyze these effects. (Pls.' Mot. for Summ.J. at 26 27.)

**3.** Although not discussed in detail by the parties, USA–ALL satisfies the other two elements of constitutional standing. In order to show causation, a plaintiff must show its injuries are "fairly traceable to the conduct complained of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Rio Hondo*, 102 F.3d at 451. Since the harm alleged by USA–ALL is traceable to the Defendants' failure to comply

### ii. Zone of Interest Standing

In addition to the constitutional standing, a plaintiff must satisfy the prudential "zone of interest" standing requirement. Here, Plaintiffs must articulate an interest that *"arguably* fall[s] within the zone of interests" to be protected by NEPA. *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *See also Rio Hondo*, 102 F.3d at 448; *Nevada Land Action Ass'n v. United States Forest Serv.*, 8 F.3d 713, 715–16 (9th Cir.1993). In *Rio Hondo*, the Tenth Circuit held that the plaintiff had established zone of interest standing since it sought "to protect its recreational, aesthetic, and consumptive interests in the land and water surrounding their village." *Rio Hondo*, 102 F.3d at 448. In the same way, USA–ALL has demonstrated zone of interest standing.[4]

In summary, USA–ALL has adequately demonstrated both constitutional and prudential standing. Chatterley, however, fails to establish standing, and must be dismissed from the lawsuit.

### 2. Analysis of NEPA Claims

Summary judgment motions are appropriate vehicles for judicial review of federal administrative agency decisions. *See City & County of San Francisco v. United States*, 130 F.3d 873 (9th Cir.1997). Judicial review of federal agency actions under NEPA is accomplished through the APA and is, of course, limited to the administrative record. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Hoyl v. Babbitt*, 129 F.3d 1377 (10th Cir.1997).

The APA provides that, "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). According to the Tenth Circuit,

> An agency decision will be considered arbitrary and capricious if "the agency has relied on factors which Congress had not intended to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir.1997) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

Defendants have the burden of proving that the agency's decision was arbitrary and capricious. *See Committee to Preserve Boomer Lake v. Department of Transp.*, 4 F.3d 1543, 1555 (10th Cir.1993). When reviewing an agency decision, a court's role is quite limited: a "disagreement ... in the methodologies employed is generally not sufficient to invalidate an EA. [Courts] should simply determine whether the challenged method has a rational basis and took into consideration the relevant factors." *Id.* at 1553; *accord Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 ("Although the inquiry into the facts is to be searching and careful, the ultimate

---

with NEPA, causation is demonstrated. *See Rio Hondo*, 102 F.3d at 451. In order to show redressability, a plaintiff must establish that it is likely (as opposed to merely speculative) that the injury will be redressed by a favorable decision. *See Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130; *Rio Hondo*, 102 F.3d at 452. Since the injuries identified by USA–ALL would be redressed by a favorable decision requiring Defendants to comply with NEPA procedures, this element is also satisfied. *See id.*

**4.** The other two prudential limits of standing are first, that the plaintiff must assert his own rights and interests and may not rely on the rights and interests of others and second, that a federal court may not adjudicate "abstract questions of wide public significance." *Valley Forge*, 454 U.S. at 474–75, 102 S.Ct. 752. Based on the analysis above, USA–ALL satisfies these two limitations.

standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.").

### i. "Hard Look" Analysis

■ In reviewing federal agency actions under NEPA, a federal court must consider whether the federal agency in question took the required "hard look" at the potential environmental consequences of its decision. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Friends of the Bow,* 124 F.3d at 1213 ("NEPA sets forth a set of action-forcing procedures that require that agencies take a *hard look* at environmental consequences.") (emphasis added).

### a. Use of the Guide

Plaintiffs first argue that the EA's reliance on a study entitled "Guide to Predicting Sediment Yields from Forested Watersheds" ("Guide") is in error. (The Guide is located at AR 000691–000804.) The EA cites the Guide in a number of places for the proposition that "[r]esearch has shown that up to a 75% reduction in soil erosion is possible when road closure is applied as mitigation," and that, "[w]hen roads are permanently obliterated, a 95% reduction in erosion from the roadbed is also possible." (EA at 4–9, 4–12, 4–14, 4–16, 4–19; AR at 007054, 57, 59, 61, 64.) Plaintiffs fault Defendants for using the Guide because the Guide was developed in regard to a particular location (not Boulder Top) and says that "[e]xtrapolation of the numbers given in this guide to areas outside [that area] should be done with extreme care." (AR at 000693.) By taking Guide numbers without any consideration of local conditions, Plaintiffs argue that Defen-

dants violated the hard look mandate of NEPA.[5]

■ Based on the administrative record, it is clear that Defendants supplemented the Guide's analyses with local data and conditions. (*See, e.g.,* AR at 4897–4903, a localized analysis of Boulder Top Erosion Modeling and Sedimentation; Table 4–1 and 4–2, found at AR 7052, EA 4–7, compares the various figures in a "Summary of lakes affected by roadbed erosion for each alternative" and a "Summary of sediment from roadbeds, and restoration acres for each alternative.") Furthermore, the EA recites that the Defendants' decision to close the roads was based on a number of factors, including observations of agency personnel:

> The Forest Management Team, including the Forest Supervisor, his primary staff, and the Teasdale District Ranger participated in a field review of the project area that resulted in direction for the ID [Interdisciplinary] team.

> During the initial phase of planning for the ... Project, the Interdisciplinary Team (IDT) developed a preliminary list of issues ... including road closures, road reconstruction and trail construction, and the effect of these activities on the natural resources on the area.

> The ID Team visited the area on August 24–25, 1993 to further clarify and refine these issues. Information and concerns from this field visit, the public involvement process, resource specialists in the Forest Service, and from other public agencies were used to finalize significant issues. The [ID] Team evaluated the initial public and agency information and confirmed three significant issues [including the impact of roads on the envi-

---

5. During oral argument, the Plaintiffs emphasized that it was not their intent to require Defendants to use to a certain method of analysis, but instead to highlight that the method used by Defendants was entirely unscientific. To the extent Plaintiffs want Defendants to use a different method of analysis, that is clearly not their right. *See, e.g., Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993) ("We defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor, consideration of which was essential....").

ronment] that would drive the development and evaluation of alternatives.

(*See* EA at 2–1; AR at 7010.)

Defendants' decision to use the Guide and their actual method of use were not arbitrary or capricious.

### b. Omission of Potential Environmental Factors

Plaintiffs next argue that the EA is flawed because it fails to consider potentially important environmental factors involved on Boulder Top. *See Boomer Lake*, 4 F.3d at 1551–53 (holding that a court's review of whether the Secretary's decision was arbitrary and capricious involves determining whether the decision "was based on a consideration of the relevant factors"). According to Plaintiffs, the EA is defective since it fails to consider the cumulative watershed effects that occur from multiple other activities, especially grazing. Although Defendants knew about the possible siltation effects of grazing, the EA dismisses that issue by stating that "The impact of livestock grazing on riparian areas is generally beyond the scope of this analysis." (EA at 3–6, AR at 007025.)

Plaintiffs point to one of Defendants' own publications—"Determining the Risks of Cumulative Watershed Effects Resulting from Multiple Activities (Watershed Effects)"—which states that multiple variables are involved in siltation problems. (The Watershed Effects Report is located at AR at 03777–03795.) Plaintiffs' argument appears to be that the EA is faulty because it fails to take into account the other possible causes of the siltation problem.

Defendants argue that their decision to deal with roads, and not deal with grazing, was not arbitrary and capricious. In support, Defendants point to the Fisheries Management Guidelines ("Guidelines"), a 1992 survey of twenty-one Boulder Mountain lakes by UDWR and Forest Service biologists. (The Guidelines are located at AR at 4699–4729.) The Guidelines advise

that many of the lakes on Boulder Top "were being severely impacted by sedimentation," and discuss potential causes and possible solutions:

> Poor road condition and/or improper road location are yielding the *most impacts*. However, grazing and camping activities along lake shores are also contributing sediment and organic material into the lakes. Problem roads should either be improved or closed depending on fish and land management objectives. Camping and grazing should be discouraged in problem areas in order to prevent further degradation and loss of sportfishing opportunities.

(AR at 4705–06) (emphasis added).

In addition to the Guidelines, Defendants' decision to focus on roads was based on extensive observations of the siltation problem by agency personnel. (*See, e.g.*, EA at 3–2, AR at 7021, describing the siltation problems caused by the roads; EA at 2–1, AR at 7010, stating that a Forest Management Team identified road conditions as a primary cause of the siltation problem.) Agency personnel noted that the poor road condition resulted in "sediment delta fans forming where the roads approach[ed] the lakes" (EA at 4–27, AR at 7072; *see also* AR at 000174, noting that roads' contribution to the sediment problem was "evidenced by gullies in the roads, sediment in ditches adjacent to the roads, and by sediment fans forming in lakes immediately below roads.")

Importantly, Defendants have identified the environmental impact of grazing as an important concern. According to the AR, however, the grazing issue is "being dealt with through revision of the [grazing] allotment management plans for the Boulder Top." (AR at 5166.) Defendants have, therefore, not ignored the grazing effects on sedimentation; rather, they have reasonably decided to deal with those issues elsewhere.

 Based on the Guidelines and independent observations by agency personnel,

the Defendants concluded that "Erosion from these roads is much greater than other sources and therefore, a more urgent problem when considering the consequences of not taking action in order to correct them. The project was initiated in order to correct the road sedimentation problems." (AR at 000389.) The decision to focus on roads exclusively was not arbitrary and capricious.

### c. Segmentation Analysis

Plaintiffs' third argument is that the separation of the Boulder Top Project and the grazing initiatives amount to prohibited "segmentation." Segmentation refers to the rule that related agency activities must be considered in a single impact statement and not divided "into smaller parts, each of which taken alone does not have a significant impact but which taken as a whole has cumulative significant impact...." *City of Rochester v. United States Postal Serv.*, 541 F.2d 967, 972 (2nd Cir.1976) (internal citations omitted).

■ As an initial matter, agencies should be given "considerable discretion in defining the scope of an EIS." *Northwest Resource Info. Ctr., Inc. v. National Marine Fisheries Serv.*, 56 F.3d 1060, 1066 (9th Cir.1995). Additionally, Plaintiffs have not shown how limitation of grazing and closing of roads (i.e. taking the two actions together) would have a "cumulative significant impact."

In addition, because the Defendants rationally concluded that road conditions were the major cause of lake siltation, they had reason to exclude grazing from this EA. Since the decision to limit the scope of the EA was rationally-based, the court must defer to the agency. *See id.* at 1069 ("While we cannot allow an agency to segregate its actions in order to support a contention of minimal environmental impact, we also cannot force an agency to aggregate diverse actions to the point where problems must be tackled from every angle at once.").

In summary, the Plaintiffs have not shown that Defendants failed to take the required "hard look" at the relevant environmental factors involved in the proposed action. By all accounts, the EA is valid.

### ii. Decision to Not Prepare an EIS

NEPA requires that an EIS be prepared for major federal actions significantly affecting the quality of the human environment. *See* 42 U.S.C. § 4332(c)(i). The "arbitrary and capricious" standard applies to review of a federal agency's decision to not prepare an EIS. *See Oregon Natural Resources Council*, 490 U.S. at 375–76, 109 S.Ct. 1851; *Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.1992). As discussed above, this standard of review is a narrow one. *See Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 ("Although the inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.").

A federal agency is not obligated to prepare an EIS unless the proposal is a "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c)(i). The Council on Environmental Quality regulations provide guidance for determining "significance," listing a number of factors to be considered, each characterized under the heading "context" or "intensity." *See* 40 C.F.R. § 1508.27. The Supreme Court has stated that these regulations are entitled to "substantial deference." *See Oregon Natural Resources Council*, 490 U.S. at 372, 109 S.Ct. 1851. Plaintiffs argue that the Boulder Top Project will significantly affect the quality of the human environment because (1) Boulder Top is a unique geographic area and (2) the project will cause significant indirect environmental effects such as overuse of the areas and roads that remain open.

The EA acknowledges that Boulder Top is a unique geographic area. (*See* EA at 1–2; AR at 007005) ("The Boulder Top is a

unique area on the Forest due to its relative remoteness, high elevation, numerous lakes, and dispersed recreation opportunities.") This fact, however, is not dispositive. *See* 1508.27(3) (listing uniqueness as only one of ten factors to be considered in evaluating significance).

Plaintiffs next argue that an EIS was required because of the indirect environmental effects that the proposed action could cause. Plaintiffs discuss potential "overuse of the areas and roads that remain open" and overuse of the accessible takes. (Pls.' Br. at 26.) According to the Plaintiffs, if the same number of visitors travel to Boulder Top in motorized vehicles after the road closures, the "traffic density on the open roads can be expected to more than triple." (*Id.* at 27.) In addition, an increase in the number of people using the accessible lakes could potentially lower fish stockpiles there. (*See id.*)

The EA and AR address these environmental impacts when evaluating the proposed action and its alternatives. (*See* EA at 4–1 – 4–7; AR at 7046–52) (transportation); (EA at 4–7–4–20; AR at 7052–65) (soils and watershed); (EA at 4–20–4–28; AR at 7065–73) (fisheries); (EA at 4–70–4–82; AR at 7115–27) (recreation). According to the EA, Defendants were aware of the "concern that the proposed road improvements may increase access and use on Boulder Mountain." (EA at 2–2; AR at 7011.) Indeed, the access issue was one of the three "significant issues" that drove the development of alternatives in the EA. In the discussion of this issue, the EA notes that "[c]onversely, other[s] feel that the proposed road closures may decrease access and use on Boulder Mountain." (*Id.*)

According to the administrative record, the project provides for the continued monitoring of the area to ensure that the impacts are not beyond what is expected, so that changes can be made if necessary to reduce impacts. (*See, e.g.,* AR at 000376, "Monitoring of the effects of implementing any alternative is an integral part of any alternative. The purpose of the monitoring is to determine if the actions that are implemented are effective. If they are not effective, additional measures could be considered with appropriate review and assessment."; EA at 4–102, AR at 007147, outlining the monitoring goals and plans.)

■ Defendants considered the relevant factors and reasonably determined that no EIS was necessary. Since their decision was not arbitrary and capricious, this conclusion may not be disturbed.

### B. Rehabilitation Act Claim

Plaintiffs argue that Defendants violated the Rehabilitation Act by excluding qualified disabled individuals from access to Boulder Top, solely for reasons of their disability. Both Defendants and Intervening Defendants argue that this court lacks subject matter jurisdiction to decide this claim since Plaintiffs have not exhausted their administrative remedies.

According to the Supreme Court, "the [administrative] exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Darby v. Cisneros,* 509 U.S. 137, 144, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) (internal citations omitted). In *Darby,* the Court held that "the exhaustion doctrine continues to exist under the APA to the extent that it is required by statute or by agency rule as a prerequisite to judicial review." *Id.* at 153, 113 S.Ct. 2539.

There is a statutory exhaustion requirement for suits pertaining to actions of the Department of Agriculture, of which the Forest Service is a part:

Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before

the person may bring an action in a court of competent jurisdiction against:

(1) the Secretary;

(2) the Department; or

(3) an agency, office, officer, or employee of the Department.

7 U.S.C. § 6912(e). 7 C.F.R. Part 15e implements the Department's compliance with the Rehabilitation Act, and includes certain administrative exhaustion requirements.

■ Plaintiffs maintain that "the requirement of the exhaustion of administrative remedies is a judicially-created doctrine and may be waived by the court." (Pls.' Resp. Br. at 8.) Plaintiffs first argue that the court should waive the exhaustion requirement based on a balancing of interests test as articulated in *McCarthy v. Madigan*, 503 U.S. 140, 146, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). According to *McCarthy*, judicial discretion regarding administrative exhaustion is only appropriate "where Congress has not clearly required exhaustion...." *Id.* at 144, 112 S.Ct. 1081. On the other hand, "[w]here Congress specifically mandates, exhaustion is required." *Id.* Since 7 U.S.C. § 6912(c) statutorily requires exhaustion prior to bringing this type of claim, waiver of the exhaustion requirement is inappropriate.[6]

Plaintiffs next take the position that the court should waive the exhaustion requirement since the chance of obtaining adequate relief through an administrative appeals process is improbable. (Pls.' Resp. Br. at 12.) The Tenth Circuit has held that "A court may excuse exhaustion if administrative remedies would be futile, when administrative remedies would provide inadequate relief, or when the agency has adopted a policy or practice of general applicability which is contrary to law." *Bryan v. Office of Personnel Management*, 165 F.3d 1315, 1319 n. 4 (10th Cir.1999); *see also Urban v. Jefferson County Sch.*

*Dist.*, 89 F.3d 720, 725 (10th Cir.1996) ("Administrative remedies are generally futile or inadequate when plaintiffs allege 'structural or systemic failure and seek system wide reforms.'"). Since Plaintiffs have failed to establish why an administrative appeal would be futile, this argument must also be rejected.

In summary, Plaintiffs' failure to exhaust existing administrative remedies deprives this court of competent subject matter jurisdiction. This claim, therefore, must be dismissed.

### C. APA Claim

Plaintiffs re-allege their NEPA claims under a freestanding APA claim. (*See* Am.Compl. at 20) (alleging a "Violation of the [APA]"). This court has no jurisdiction to hear a claim brought under the APA since the "APA provides no substantive requirements, but merely provides the framework for judicial review of agency action. Accordingly, 'there is no right to sue for a violation of the APA in the absence of a relevant statute' whose violation 'forms the basis for [the] complaint.'" *Preferred Risk Mut. Ins. Co. v. United States*, 86 F.3d 789, 792 (8th Cir.1996) (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Accordingly, this claim must be dismissed.

The court orders that (1) Anthony Chatterley is dismissed since he fails to demonstrate standing; (2) Plaintiffs' motion for summary judgment is DENIED; and (3) Defendants' and Defendant–Intervenors' motions for summary judgment are GRANTED.

SO ORDERED.

---

**6.** Plaintiffs also cite *Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926, 932–33 n. 7 (10th Cir.1975), apparently for the proposition that exhaustion is not an issue implicating subject

matter jurisdiction. While this may be correct, it does not change the court's conclusion that waiver is not warranted in this case.